Filed 7/8/21  P. v. Simpson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045973 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1519080) |
| v. | |
| BENJAMIN LEE SIMPSON, | |
| Defendant and Appellant. | |

Defendant Benjamin Lee Simpson was convicted by a jury of four counts of committing lewd and lascivious acts on a child under the age of 14 (Pen. Code, § 288, subd. (a))[1] against his wife's two younger sisters.  The trial court sentenced Simpson to a term of 30 years to life in prison.

On appeal, Simpson argues:  (1) the trial court improperly dismissed one of the jurors during deliberations, (2) the trial court erred by refusing to further inquire into allegations of juror misconduct and erred when it denied his posttrial motion for new trial without holding an evidentiary hearing on his juror misconduct claim, (3) the trial court erred in admitting expert testimony that false reports of child sexual abuse are statistically rare, (4) the trial court erred by excluding the testimony of a defense expert witness, (5) the trial court erroneously admitted evidence under Evidence Code section 1108, (6) the trial court erroneously excluded evidence of a pretext phone call where he denied

---

[1] Unspecified statutory references are to the Penal Code.

the allegations that were made against him, (7) the fresh complaint evidence exceeded the scope of the doctrine, (8) the prosecutor committed misconduct during argument and cross-examination, (9) his trial counsel rendered ineffective assistance on multiple grounds, and (10) the alleged errors were cumulatively prejudicial. As we explain, we find no merit in his contentions and affirm the judgment.

## BACKGROUND

### A. *First Amended Information*

On September 25, 2017, the Santa Clara County District Attorney's Office filed a first amended information charging Simpson with five counts of committing a lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)) against his wife's two younger sisters, victim1 (counts 1, 2, & 3) and victim2 (counts 4 & 5). It was alleged as to each count that Simpson had committed sexual offenses against multiple victims (§ 667.61, subds. (b) & (e)).

### B. *The Prosecution's Case*

#### 1. *Victim1's Testimony*

Victim1 was born in 1998 and was 18 years old at the time of Simpson's trial. Victim1 was the youngest of her siblings, and she had two brothers and two sisters. Simpson was married to victim1's oldest sister ("wife"). Wife was around 33 years old at the time of Simpson's trial. Victim1's other sister, victim2, was three years older than victim1 and was 21 years old at the time of Simpson's trial. Victim1's oldest brother ("older brother") was 32, and he was married to victim1's sister-in-law ("sister-in-law").

Victim1 lived with her family in San Martin, California.[2] When victim1 was younger, wife often watched victim1 when victim1's mother ("mother") was busy with

---

[2] We collectively refer to victim1 and victim2's immediate family as the "Doe family."

2

the Doe family's other children. Victim1 was around three years old when wife started dating Simpson. Victim1 viewed Simpson as a big brother, and she regularly spent time with him. Sometimes, Simpson and wife babysat victim1 and victim2. Other times, Simpson babysat victim1 by himself. After several years of marriage, wife and Simpson had four children together. Victim1 frequently babysat wife and Simpson's children. By the time of Simpson's trial, victim1 had not spoken to wife in about three years.

Victim1 recalled that her feelings about Simpson changed when she became old enough to realize that Simpson had sexually abused her multiple times when she was a child. Victim1 estimated that Simpson molested her approximately a dozen times. Victim1 recalled that the abuse started when she was around five or six years old and ended when she was around 11 years old. Victim1 could not remember the exact details of every incident. Victim1 explained that the memories of the abuse were "very painful," and she tried to forget them. When victim1 was around 14 years old, she started to have memory "flashes" and recalled past events, including being molested by Simpson.

Victim1 could recall the specifics of only two incidents of abuse. The first incident that victim1 remembered took place at the Doe family house in San Martin when she was around five or six years old. Victim1 remembered that the incident occurred while she watched "Spiderman, the first [movie]" with Simpson and victim2 while lying down on her parents' bed in her parents' bedroom. Both victim1 and victim2 laid down next to Simpson on their sides, with Simpson in between them. Simpson slid his hand down victim1's back under her shirt and pants and placed his finger inside her anus. Victim1 could not see Simpson's other hand, but she believed that Simpson touched victim2 in the same way. Simpson left his finger inside victim1's anus for up to an hour. Victim1 did not say anything to Simpson, and she did not tell anybody about what had happened with Simpson that day.

3

The second incident that victim1 recalled took place at Simpson's house in Gilroy when she was around 11 years old. Victim1 remembered that she, victim2, and Simpson watched the movie "Toy Story 3." At the time, "Toy Story 3" was still playing in theaters, but Simpson had managed to obtain a copy of the movie. Victim1 "[p]ossibly" recalled telling a detective that she remembered that wife was away in Missouri at the time. Victim1 laid down on a mattress with Simpson to watch the movie, and Simpson placed his finger inside victim1's anus and moved it around. Victim2 was in the same room, but she was not on the mattress.

When victim1 was around 15 or 16 years old, sister-in-law came to the Doe family's house upset and crying. Sister-in-law spoke with mother and asked victim1 if Simpson had ever touched her inappropriately. Victim1 answered yes. However, the police were not contacted.

About a year later, sister-in-law and older brother reported Simpson's actions to the police. At the time, victim2 was unhappy that the police had been contacted. She did not want to have to talk to the police or answer questions about what had happened with Simpson. She was also concerned about her relationship with wife. Later, victim1 learned that Simpson and sister-in-law had an affair.

Victim1 could not recall any inappropriate incidents that took place inside the shower at Simpson's apartment when he and wife lived in San Jose. In fact, victim1 could not recall ever going to Simpson's apartment in San Jose. She also could not recall any inappropriate incidents that took place with Simpson on a family beach trip. Victim1 knew that Simpson and wife moved to Hawaii when she was around four or five years old, and they lived there for about a year. Victim1 believed that Simpson and wife moved to Hawaii before Simpson started touching her inappropriately.

4

## 2. *Victim2's Testimony*

Victim2 was born in 1995 and was 21 years old at the time of Simpson's trial. Victim2 was around six years old when Simpson started dating wife. Simpson touched victim2 inappropriately when she was between the ages of eight and 11. Victim2 could recall three specific incidents. Victim2, however, blocked out most of the memories, which she described as traumatic.

The first incident that victim2 recalled took place shortly after wife and Simpson got married, when victim2 was around eight years old. Victim2 remembered that she and victim1 went over to wife and Simpson's small studio apartment in San Jose for a sleepover. Victim2 and victim1 went to take a shower, and Simpson went into the shower with the two girls. The shower was small, and it felt cramped with three people inside of it. Victim2 said that she was not sure where wife was when they took a shower and that wife might have gone to the store to get ice cream. Simpson used a loofah to wash victim2, touching her chest, buttocks, and vagina. Simpson did not touch victim2 directly, and victim2 did not see Simpson touch victim1. Victim2 remembered that Simpson told her not to get soap in her vagina. Wife was outside the bathroom when victim2, victim1, and Simpson came out of the shower. Victim2 did not remember if wife said anything after they came out of the bathroom.

The next incident that victim2 recalled took place sometime before she was 10 years old. Victim2 could not remember if this incident took place before or after the shower incident. Victim2 remembered that she had gone to the beach with younger brother, victim2, and Simpson. Victim2 got sand in her bikini bottoms, and Simpson brought her to the bathroom to wash the sand out. Victim2 took her pants off, and Simpson used his hands to take some water and wipe off the outer areas of her vagina. Victim1 was also in the bathroom, but victim2 could not remember what she was doing.

5

Victim2 remembered that she did not like what Simpson did, and she remembered thinking that she could have cleaned herself up.

The last incident that victim2 recalled took place when she was around 10 or 11 years old. Wife and victim2's parents were in Colorado for a funeral, and Simpson came over to the Doe family house to watch victim1, victim2, and younger brother for three days. Victim2 had bad nightmares for two nights. The first night she had a nightmare, she went over to Simpson, who was sleeping in her parents' bedroom. Simpson told victim2 to crawl into bed with him, and she did. Victim2 turned away from Simpson in the bed, and Simpson placed his hand underneath victim2's pajama bottoms and underwear and touched her buttocks. Nothing else happened, but victim2 felt uncomfortable and had a hard time falling back sleep. The next morning, Simpson taught victim2 how to make scrambled eggs.

Simpson touched victim2 again the next night. This time, both victim1 and victim2 were in bed with Simpson. Victim2 could not remember how they got into bed together, but she remembered that they were getting ready to sleep. Simpson placed his hand under victim2's pants and underwear and rested it on victim2's buttocks. Victim2 was able to fall asleep, but she did not remember what happened after she woke up.

Victim2 remembered that Simpson stopped touching her around the time that she turned 11 years old. Simpson's actions impacted victim2's relationships, and she became scared of men. When victim2 was 12 years old, she dated J.G. One time, when victim2 and J.G. were kissing, victim2 had a flashback about what had happened with Simpson, and she pushed J.G. off. Three years later, she explained to J.G. that she had been thinking about what had happened with Simpson. At various times, she also told several friends that she had been molested.

After victim2 had the flashback while kissing J.G., she disclosed to mother that Simpson had touched her inappropriately. Mother told her that it was up to her whether

6

she wanted to press charges against Simpson. Two years later, when victim2 was 14 years old, she spoke with mother again about what had happened with Simpson. Again, mother said that it was up to victim2 to decide whether to press charges against Simpson. When victim2 spoke with mother, mother seemed surprised "for a second." Mother sat across from victim2 and cried. To victim2's knowledge, mother never contacted the police. Victim2 also decided not to contact the police because she viewed Simpson as her brother and she "should have been able to trust him."

When victim2 was 18 years old, she told sister-in-law about what had happened with Simpson. Sister-in-law became upset after victim2 disclosed the molestation, and she took victim2 back to the Doe family house and confronted mother. At the time, victim2 did not know that sister-in-law had a past affair with Simpson. Later, sister-in-law and older brother moved to Utah, and sister-in-law eventually reported Simpson's actions to the police. Victim2 did not know that sister-in-law intended to contact the police.

Victim2 had an active imagination as a child. She used to tell stories about having pets that she did not have or going on vacations to Disneyland. Usually, when she told stories, each story would be different. One time, victim2 watched a video on YouTube that showed someone falling off a tractor. A day later, she told a story that her father had fallen off a tractor and had broken both legs. Victim2 explained that she had an active imagination, and she had mistakenly associated what she had seen in the video with her life. However, the "stories" that she remembered about Simpson were always the same, and they always involved Simpson touching her.

3. ***Sister-in-law's Testimony***

Sister-in-law was married to older brother. She was close with the Doe family, and she viewed both victims as her "little sisters." Sister-in-law was 28 years old at the time of Simpson's trial, and she was about seven years older than victim2.

7

In 2014, victim2 told sister-in-law that Simpson had touched her inappropriately while she was sleeping at the Doe family house. Victim2 also told sister-in-law that Simpson had done the same thing to victim1. Sister-in-law took victim2 to the Doe family house. Mother called victim1 over, and sister-in-law asked victim1 if victim2's statements were true. Victim1 said that victim2's statements were true, and there was "[l]ot[s] of crying." Sister-in-law thought that the incidents would be reported to the police.

Several weeks later, sister-in-law and older brother moved to Utah. After her move, sister-in-law did not have any conversations with victim1 or victim2 about what had happened with Simpson. Later, sister-in-law learned that the police had not been contacted. In 2015, sister-in-law called the police department in Gilroy and reported that Simpson had molested victim1 and victim2. Sister-in-law also told the police that she had a prior affair with Simpson. The affair took place in 2007, when sister-in-law was 18 years old, and lasted three or four months. Older brother became angry after he learned of sister-in-law's affair with Simpson.

### 4. *Mother's Testimony*

Mother had five children, wife, older brother, younger brother, victim1, and victim2. Wife and Simpson lived in the Doe family house for a short period of time after they were married, and they later moved to a studio apartment in San Jose. Wife and Simpson lived in the studio apartment for a few months before they moved to Hawaii, where they lived for a year. They later moved back to California and lived with Simpson's parents in Morgan Hill before they moved to Gilroy. Wife and Simpson would come over to the Doe family house and spend time with the family when they lived in Gilroy. Sometimes, victim1 and victim2 would go over to wife and Simpson's house to spend the night.

Mother recalled that she, her husband, wife, and two of wife's children went to a funeral in Colorado in April 2007. Victim1 and victim2 stayed home. Mother remembered that older brother, sister-in-law, older brother and sister-in-law's son, younger brother, and Simpson all stayed at the Doe family house during that time.

In June 2010, mother, wife, and three of wife's children went to visit mother's father in Missouri. Victim1, victim2, and Simpson did not go with the family to Missouri.

Mother knew that victim2 had a "creative mind" and often told stories. Victim2 started telling stories when she was two years old. None of the stories that she told involved sexual scenarios or being abused. One time, victim2 told her kindergarten teacher that her father had fallen off a tractor and broken both of his legs. Victim2's father had broken his legs when he was two years old, but the story about the tractor was not true. Another time, when victim2 was five years old, she told a story that she had another mother in New York. Other times, victim2 told stories about going to Disneyland or having pets that she did not really have. As victim2 got older, she stopped telling stories. Victim2 had not told false stories since she was 16 years old. Victim1, on the other hand, had a "[n]o nonsense" personality, and she did not like to tell stories like victim2 did.

One day, victim2 disclosed to mother that Simpson had "touched her down there," pointing to her vaginal area. Mother believed that victim2 was expressing that Simpson had touched her inappropriately. Victim2 was on the "verge of tears" when she spoke with mother. Mother told victim2 that they should speak to her father, and victim2 said that she did not want to and that she wanted to "forget it." Victim2 said that she had blocked out some of the details about what had happened. Mother could not remember when victim2 made her disclosure.

9

Mother did not bring up the abuse again. Mother had a difficult time "wrap[ping her] head around" what victim2 had said, and she did not want to believe that it was true. Mother, however, said that she believed something did happen with Simpson, but she did not know exactly what happened.

Sometime later, sister-in-law came to mother's house and sat down with mother, victim1, and victim2. Sister-in-law asked victim1 if Simpson had touched her inappropriately. Victim1 answered yes. Victim1 also said that she would probably lie and say that nothing had happened with Simpson if she was asked about it because she was not ready to deal with what had happened to her. Older brother wanted victim2 to go to the police because she was over 18 years old at the time. Victim2 said that she would contact the police "[t]o appease her brother," but she never did. Mother also did not contact the police.

Shortly after sister-in-law spoke with mother, sister-in-law and older brother moved to Utah. About a year later, sister-in-law told older brother that she had had an affair with Simpson. Eventually, sister-in-law called the police and reported that Simpson had molested victim1 and victim2.

### 5. *Detective Toomey's Testimony*

Santa Clara County Sheriff's Office Detective Jennifer Toomey was assigned to the case in June 2015. Detective Toomey spoke with both victims, and the interviews were played for the jury.

Detective Toomey recalled that victim1 told her about an incident that took place when she watched "Toy Story 3" with Simpson. Victim2 told Detective Toomey that she watched the movie at home even though the movie was still in theaters. Detective Toomey obtained records that reflected that "Toy Story 3" was released in theaters on June 18, 2010, and on DVD on November 2, 2010.

10

Detective Toomey also located an apartment complex where Simpson and wife had previously lived in San Jose. Detective Toomey went inside the apartment and was able to take some photographs, including photographs of the shower stall inside the apartment. Detective Toomey also obtained records that showed that Simpson moved out of the apartment in October 2003.

On redirect examination, Detective Toomey testified that she was not aware of any research that discussed the "suggestibility of child witnesses," whether "witnesses as old as 16 are suggestible to false information," whether "children are resistant to be given false information about sexual conduct," or anything "related to false allegations of child sexual assaults."

### 6. *Dr. Blake Carmichael's Testimony*

Dr. Blake Carmichael testified for the prosecution as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Carmichael explained that there are five components of CSAAS: secrecy; helplessness; entrapment or accommodation; delayed, unconvincing, or conflicted disclosure; and recanting or retraction.

The first element, secrecy, is derived from the perpetrator's reliance on the child not reporting the abuse. Sometimes, the perpetrator is someone that the child trusts and has an ongoing relationship with, and the perpetrator does not need to say or do much to keep the child from telling anyone about the abuse. Depending on the child's age, the child may not understand that the sexual abuse is inappropriate. The child also may not want to disclose the abuse because of the negative impact on the perpetrator and the rest of the family.

The second element, helplessness, occurs because if the abuse happens in secret, the child may be unable to stop the abuse without assistance. The child may think that he or she will not be believed if they disclose the abuse, and the helplessness that he or she feels may contribute to their decision to keep the abuse a secret.

11

The third element, entrapment or accommodation, is related to the secrecy of the abuse and the child's feeling of helplessness. The child may try to deal with the abuse in different ways. The child may also distance or disassociate him or herself from the experience, and either "spac[e]" or "numb[]" out."

The fourth element, delayed, unconvincing, or conflicted disclosure, is when a child does not immediately disclose the abuse. Studies have shown that anywhere from 50 to 75 percent of children who have been sexually abused do not tell anyone during the first year, and 40 to 60 percent of children will not tell anyone after they turn 18 years old. When a child does make a disclosure, he or she may not always be consistent in recounting the facts.

The final element, recanting or retraction, typically involves a smaller segment of abused children. Sometimes a child is abused and later, when asked about the abuse, he or she denies or retracts their statement. Some research has indicated that between 17 to 24 percent of abused children will retract their allegations.

Dr. Carmichael then testified about research in the area of false memory and CSAAS. Research findings have showed that false memories occur more naturally with "more plausible things, things that [a person] can relate to," such as getting lost at the mall. However, it is more difficult to get people to adopt or accept that uncommon things have happened to them. Research has also showed that children are resistant to memories that relate to sexual touching even if they are in a suggestive environment. Furthermore, children typically become "far less suggestible" as they get past the age of five.

Subsequently, Dr. Carmichael testified about the statistical rate of false allegations of child sexual abuse. According to Dr. Carmichael, false allegations of sexual abuse made by children are "quite rare." Some studies have found higher percentages of false allegations, but those cases involved custody disputes and "custody child-access issues," and the higher rates of false allegations were usually made by adults. Dr. Carmichael

12

testified that "[p]ercentage wise, you're looking at zero to two and a half or four percent, or so, of false allegations made outside of that custody arena," and that "even in some of those studies, none of them [the false allegations] were made by kids."

On cross-examination, Dr. Carmichael reiterated that CSAAS is not a diagnostic tool; it is an educational tool used "to describe this population of [sexually abused] kids." Dr. Carmichael confirmed that his testimony was based on studies of children who were known to be sexually abused. Dr. Carmichael also reiterated that the population of children that make false allegations is "low," and the rates of false allegations are "in that zero to two and a half and sometimes six percent range."

Dr. Carmichael, however, testified that CSAAS is not a "scientific study." CSAAS is also not accepted by the American Psychiatric Association's Diagnostic and Statistical Manual. Dr. Carmichael acknowledged that there are some criticisms of CSAAS, but he opined that the "vast majority" of critics agree that children delay disclosures, abuse happens in secret and some children recant. Dr. Carmichael also testified that one critic of CSAAS has written that "you can assume that most crimes of sexual abuse are true or valid."

### 7. A.C.'s Testimony

A.C.'s parents and Simpson's parents were friends, and A.C. and Simpson grew up together. Simpson was around five years older than A.C. When A.C. was between 12 and 14 years old, he went to Simpson's house and played video games with him, including a game called "Tomb Raider," which featured a main female character named Lara Croft. At some point, A.C. fell asleep and was woken up by Simpson. Simpson told A.C. that he wanted to show him something, and A.C. followed Simpson to the living room, where Simpson was using a computer. There, Simpson showed A.C. a nude cartoon image of Lara Croft. Simpson asked A.C. what he thought about the picture, but A.C. did not respond because he felt uncomfortable. A.C. went back to sleep.

13

### 8. J.C.'s Testimony

When J.C. was a child, he attended the same church as victim1 and victim2's family. J.C. said that he did not date victim2. When J.C. was around 11 or 12 years old, his family moved to Florida. While in Florida, J.C. reconnected with victim2 over social media. Victim2 sent J.C. messages over social media disclosing that Simpson "would touch her in her room." At the time, J.C. thought that victim2 meant that she had a physical altercation or fight with Simpson. Victim2 told J.C. that she was "damaged" and that it would take her a "while to recover from it." J.C. and victim2 had subsequent conversations about unrelated matters. Victim2 did not discuss being touched by Simpson again.

### 9. C.A.'s Testimony

C.A. was friends with victim2 and had met her through participating in 4H activities. C.A. had known victim2 for around 10 years, and she considered victim2 to be her best friend. In 2012 or 2013, victim2 told C.A. that Simpson had molested her and victim1. Victim2 and C.A. had been discussing relationships, and victim2 had said that she did not want anything to happen on a "physical level" and was having a hard time dating. C.A. asked her why, and victim2 responded that something had happened to her when she was a child. Victim2 told C.A. that she had not told anyone else about what had happened, and C.A. reassured her that she could tell her anything. At that point, victim2 told C.A. that she had been "molested." It took a long time for victim2 to speak, and when she finally told C.A. about what had happened with Simpson, she burst into tears. Victim2 told C.A. that she felt dirty, and she was afraid that she would never have a healthy relationship. C.A. asked victim2 if Simpson had raped her, and victim2 told C.A. that "it was molest."

14

### 10. *A.C.2's Testimony*

A.C.2 was 18 years old at the time of Simpson's trial and was good friends with victim1. A.C.2 had been friends with victim1 since they were both around 12 years old. During the summer when A.C.2 and victim1 were 13 years old, A.C.2 and victim1 went to clean out the Doe family's goat barn. While cleaning the stalls, A.C.2 and victim1 decided to tell each other things that they had never told anyone else before. Victim1 told A.C.2 that "a family member had molested her." Victim1 specified that the person was her "older sister's husband." At the time, victim1 seemed hesitant to tell A.C.2 her secret. She cried and appeared scared that someone was going to overhear their conversation. Victim1 did not want to tell A.C.2 any details about what had happened. A.C.2 told victim1 that she should tell mother about the molestation. Victim1 responded that she did not want to ruin the relationship that mother had with wife and Simpson's children.

## C. *The Defense's Case*

### 1. *Wife's Testimony*

Wife met Simpson in a church group camp in 1999 and started dating him in 2000. When wife and Simpson first met, wife was one of the students attending the camp and Simpson, who was four years older than wife, was one of the chaperones. Wife and Simpson got married in 2003. After they married, wife and Simpson moved to a studio apartment in San Jose in August 2003, where they lived for several months.

Wife remembered that the shower in the studio apartment was small. Wife and Simpson had attempted to take a shower together, but when Simpson got inside the shower, he took up all the space. Wife could not recall victim1 and victim2 ever spending the night or taking a shower at the apartment. Since the apartment was small, victim1 and victim2 would have had no place to sleep, sit, or eat. When wife and

15

Simpson lived in the apartment, they always went to the grocery store together, and wife never went to the store by herself.

In October 2003, wife and Simpson moved to Hawaii. They moved back to California in February 2005 and lived with Simpson's parents before moving to Gilroy.

In 2007, wife went with her two children and her parents to Colorado for a funeral for three or four days. Older brother and sister-in-law stayed over at the Doe family house with victim1 and victim2. Younger brother was also at the house.

In 2010, wife went with mother and wife's three children to Missouri to visit wife's dying grandfather. Victim1 and victim2 stayed at home with their father. While on her trip to Missouri, wife spoke to Simpson every day. Simpson never mentioned that he was going to spend the night at the Doe family house.

According to wife, it was "probable" that she had gone on a beach trip with victim1, victim2, and other family members. Wife, however, did not recall an occasion where she told Simpson to help clean sand out of victim2's bathing suit.

Wife had not spoken with victim1 or victim2 since June 2015. Wife used to talk to victim2 about her issues with school and friends, and wife usually gave victim2 advice. Wife was closer to victim1, who used to help wife with her children.

Wife knew that Simpson knew how to obtain movies before they were released on DVD. Wife remembered that Simpson obtained this ability sometime after 2009.

In June 2015, older brother called wife and told her that sister-in-law had had an affair with Simpson and that Simpson had molested victim1 and victim2. Sister-in-law sent wife an e-mail, but wife did not read it. Wife knew that Simpson and sister-in-law had an "emotional affair," but she did not know about the physical nature of their relationship until June 2013. Wife had previously confronted Simpson about his emotional affair with sister-in-law in June or July 2007. When older brother learned of

16

sister-in-law's affair, he became hostile toward wife and Simpson. Older brother said he wanted Simpson "[a]rrested, burned, shot, killed."

On cross-examination, wife acknowledged that she had read all the police reports associated with Simpson's case, including the statements made by victim1, victim2, and mother, and the preliminary hearing transcripts. Wife also acknowledged that she had read her own preliminary hearing transcript to prepare for trial.

### 2. *Simpson's Testimony*

Simpson remembered living in the studio apartment in San Jose and was familiar with the shower that was inside of it. Simpson could not recall mother ever asking wife and Simpson to watch victim1 and victim2 when they lived at the apartment. Simpson could also not recall wife asking victim1 or victim2 to come stay at the apartment. Usually, Simpson and wife went over to the Doe family house. Simpson could not recall victim1 and victim2 ever spending the night at the apartment. Simpson denied that he ever went inside the shower with victim1 and victim2. Simpson only remembered victim1 and victim2 visiting the studio apartment twice: once when wife and Simpson first moved in, and another time when wife and Simpson moved out. During both of those visits, many other family members were present.

Simpson became involved with 4H with his own children, and once co-led a rabbit project with mother. Victim1 was one of the team leaders for the project. Simpson never touched victim1 inappropriately when he assisted in the 4H projects.

Simpson never babysat victim1 and victim2 at the Doe family house by himself. Simpson spent most of the day working. On the weekend, however, it may have been possible for Simpson to go over to the Doe family house to watch a movie. Older brother and sister-in-law, who had temporarily lived at the Doe family house, sometimes babysat victim1 and victim2. Wife was always with Simpson whenever he babysat victim1 and victim2.

17

Simpson acknowledged that he had illegally obtained movies to watch at home. Simpson, however, never watched a movie while laying on a bed with victim1 and victim2, and he denied that he ever touched them inappropriately while laying on a bed with them. He had never inadvertently touched victim1 or victim2 in an inappropriate way. Simpson remembered going to the beach with victim1 and victim2, but he never went into the bathroom with them there.

Simpson believed that it was possible that victim1 and victim2 had been molested by someone else. Simpson did not know why victim1 and victim2 would lie about what had happened, or why they blamed him.

Simpson acknowledged that he had an affair with sister-in-law. At the time of the affair, sister-in-law was 18 years old. The affair lasted around two and a half to three months and ended after Simpson broke it off with sister-in-law. Sister-in-law was hurt after Simpson ended the affair, and she continued to send Simpson messages over social media.

Simpson denied that he ever showed A.C. nude images of Lara Croft.

On cross-examination, Simpson acknowledged that he had read victim1's and victim2's statements and had seen them testify at trial.

### 3. *N.R.'s Testimony*

N.R. was a pastor and had known Simpson since 2008. Simpson was a youth assistant for her church, and he helped with Bible study. N.R. had the opportunity to work with Simpson when he assisted with study groups. N.R. always saw Simpson conduct himself appropriately with female study group members.

### D. *The Verdict*, *New Trial Motion*, *and Sentencing*

On October 12, 2017, the trial court excused Juror No. 11 and sat an alternate juror. On October 17, 2017, the jury reached a verdict, finding Simpson guilty of counts 2 through 5.[3] The trial court declared a mistrial as to count 1.

On April 19, 2018, Simpson, who had retained new counsel, filed a motion for a new trial, arguing in part that there was juror misconduct and that his trial counsel had rendered ineffective assistance.

On June 14, 2018, the trial court denied Simpson's motion for a new trial without an evidentiary hearing. Thereafter, the trial court sentenced Simpson to a total term of 30 years to life in prison, composed of 15 years to life for count 2, 15 years to life for count 3, 15 years to life for count 4, and 15 years to life for count 5. The sentence for count 3 was ordered to run concurrent to the sentence for count 2, and the sentence for count 5 was ordered to run concurrent to the sentence for count 2.

### DISCUSSION

### A. *Jury Issues*

On appeal, Simpson argues that the trial court erred when it excused one of the empaneled jurors during deliberations. He further argues that the trial court failed to make an adequate inquiry into potential juror misconduct during deliberations and that it erred when it denied his postverdict motion for a new trial without holding an evidentiary hearing on his claims of juror misconduct.

---

[3] Count 2 was the "beach incident" with victim2, count 3 was the "shower incident" with victim2, count 4 was the "Spiderman" incident with victim1, and count 5 was the "Toy Story 3" incident with victim1. The jury did not reach a verdict on count 1, which was the "nightmare" incident that victim2 alleged occurred when she had a nightmare while her parents were away.

19

### 1. *Background*

At the beginning of voir dire, the trial court advised the prospective jurors that they were obligated to disclose any bias or prejudice when they are asked to do so. Thereafter, the trial court informed the jury that the information alleged that Simpson committed five violations of section 288, subdivision (a), lewd and lascivious act on a child under the age of 14, against victim1 and victim2. After reading the charges, the trial court asked the jury, if, having heard the charges, there was anything about the case that would make any of the prospective jurors feel they could not be fair or impartial. The trial court also asked the prospective jurors, "Have you, your family, or close personal friends ever had an experience with a similar case or situation that has been investigated as a suspect, been charged with a crime, been a criminal defendant, or been a witness in a criminal case?" Juror No. 11 did not raise any issues with the trial court.

After the close of evidence, the jury began its deliberations on October 5, 2017. On October 12, 2017, the trial court met with the attorneys outside the presence of the jury to discuss a note that had been sent by the jury foreperson (Juror No. 2). Juror No. 2's note read: "There's a potential bias that has surfaced with juror number 11. Her son was accused of sexual misconduct with a minor. Charges weren't filed, but it tore her family life and son's life apart. We're unsure if she can approach this case in an unbiased way. She has indicated her frustration around this. We seek guidance from the judge." The trial court explained that Juror No. 2 also confided with another juror (Juror No. 1) who helped write the note.

The trial court questioned Juror No. 2. Juror No. 2 stated that Juror No. 11 had said that her son had ended a relationship with a girlfriend. The ex-girlfriend was upset about the breakup, so she made allegations about "sodomy [and] child pornography" against Juror No. 11's son. Subsequently, the sheriff's department went to Juror No. 11's house and executed a search warrant for evidence. Juror No. 2 explained that Juror

20

No. 11 said that the accusations against her son destroyed her son's life, and, as a result, Juror No. 11 divulged that she was having a difficult time "making a decision and evaluating the evidence." Juror No. 2 stated that it seemed that Juror No. 11 did not want to believe the "predatory profiling" against Simpson, and she "ignored the other side of the evidence" like "the information that the D.A." provided. Juror No. 2 added that several jurors were also concerned about how Juror No. 11 could evaluate the evidence without " 'carrying her baggage.' "

The trial court then questioned Juror No. 1. Juror No. 1 explained that he had the feeling that Juror No. 11 "continue[d] to be impacted by her experience" with her son's accusations, and he believed that Juror No. 11 was "intractable" even though her experience was "not necessarily affecting her ability to deliberate." Juror No. 1 stated that it seemed that Juror No. 11 had "frustration" and her experience with her son was "coloring her ability to decide" the case. Juror No. 1 explained that it seemed that Juror No. 11's "degree of hesitation" with the case was "impacting a few of the other jurors as well," and he named three jurors (Juror Nos. 5, 7, and 10) who he thought might be considering Juror No. 11's experience in their deliberations. Juror No. 1 had no proof of his statements and said that he was relying on his "instinct."

The trial court questioned Juror Nos. 5, 7, and 10. The trial court asked all three jurors if Juror No. 11's experience with her son was affecting their deliberations, and all three jurors answered no.

Finally, the trial court questioned Juror No. 11. The trial court asked Juror No. 11 why she did not bring up her experience with her son during jury selection. Juror No. 11 responded that she did not think that her experience had anything to do with the case at the time. The trial court then asked why Juror No. 11 did not speak up when the trial court asked the prospective jurors if any of them had family or close personal friends that had been accused of a crime or had been in a situation similar to the defendant. Juror

21

No. 11 stated: "So—but it made me realize that there was a situation with my son, and I wasn't thinking that that was—he was never accused of anything. Like, literally it was—they were doing this investigation, but they never came with any charges or anything like that. [¶] So to me, it wasn't in my frame of mind of him being accused of a crime because that's not what was happening in my mind. [¶] And it was a time when—at the time my ex-husband was dying. I wasn't involved in it. My dad actually took care of the situation for me because he had brain cancer. And he was dying, and I was taking care of him. [¶] But I just realized that what happened with my son, with people making judgments about him later on in life and like changing their perception of him, I felt that there was a connection there. And not that I was trying to say that what happened to my son made anybody guilty or not guilty. I was just trying to explain to them where I was coming from when it came to evaluating the situation."

Thereafter, the trial court asked Juror No. 11 if her experience with her son was "affecting [her] thoughts about the case." Juror No. 11 responded, "No. That's not what I was saying to [the other jurors]. What I was saying to them is I was evaluating the testimony of everybody that was involved." Juror No. 11 explained that the other jurors "were not just taking the testimony," they were "taking what they thought was like, pedophile—like a situation with a pedophile and trying to take that and make that like what was happening." Juror No. 11 also stated, "We're supposed to be evaluating whatever the D.A. brought as evidence and that testimony solely and not trying to take other . . . things and make it this case." Juror No. 11 then elaborated, "And let me tell you another thing that's very frustrating. Is last night when we were in the deliberation, one person said that they would be comfortable with us saying that he was guilty on two charges if we didn't agree on the other three. And I don't want to feel that kind of pressure that he's guilty on two charges because we don't want to let him go.

22

That's the pressure we're feeling in there." Juror No. 11 added that she believed that the jury must "evaluate the five counts" charged against Simpson "[b]ased on the testimony."

The trial court asked Juror No. 11 if her experience was affecting her ability to deliberate on the evidence. Juror No. 11 answered no, and she was "trying to stay on the evidence." She also explained that she was trying to have the other jurors "[b]ring it back to the case" and was "trying to explain to them, 'Let's look at this testimony.' " Juror No. 11 stated, "This is a big decision to me, not guilty versus guilty," and she "want[ed] to make the right decision."

The trial court temporarily excused Juror No. 11 from the courtroom and told the attorneys that it could be helpful to remind the jury that they must decide each count separately, and that "each count deserves their deliberation, consideration, and they have to decide each count."

The prosecutor then expressed concerns about Juror No. 11, and the "fact of the matter is that she did not bring up something about her own life experiences that is directly on point" and her explanations about not bringing it up earlier were "incredible." The prosecutor stated that had Juror No. 11 brought up this information during the jury selection process, he would have asked the trial court to excuse her for cause, and, if denied, he would have exercised a peremptory challenge.

Simpson's trial counsel responded, "Judge, can I just say for the record that it sounded to me from [Juror No. 11] that there was, for lack of a better word, bartering between a juror—if you do this, then we'll do that. I think that's improper." The trial court expressed that it was not going to "get into [the jury's] deliberations," and "[Juror No. 11] shouldn't have even mentioned anything like that." Simpson's trial counsel then stated that he believed that the jury may be going "outside the parameters of . . . the evidence and the law" because Juror No. 11 had mentioned pedophilia.

23

Again, the trial court stated that it believed that Simpson's trial counsel was "getting into the jury deliberations" which was not appropriate. The trial court then stated: "I think we need to deal with this one situation, and I think that—you know, although I think that she adequately explained why she brought it up and the fact that it was not affecting her deliberations, I also appreciate the fact that had this been brought up during jury selection, that most likely [the prosecutor] would have challenged her. So based upon that, just that fact alone, I think I have to dismiss her." The prosecutor agreed with the trial court.

Simpson's trial counsel then stated: "Well, and just for the record, I think she's adequately expressed a view that—that is not—her experience with her son is not overwhelming or causing her to—and, granted, he may well have [*sic*]." The trial court responded: "I agree with you, Counsel. I absolutely agree with you. I think she explained it away adequately as far as I'm concerned that it's not affecting her ability to deliberate on the evidence. [¶] However, had that been brought up during jury selection, I have no doubt in my mind that [the prosecutor] would have challenged her." Subsequently, Simpson's trial counsel began to say, "I—" The prosecutor then interjected and said: "And, Your Honor, just the—I don't doubt it either, and I just want to make the record clear. It's not what I would have done. It's the fact she didn't share information that one must reasonably assume that she had in her mind."

Thereafter, the trial court informed the attorneys that Juror No. 11 "ha[d] to be dismissed," and that it intended to replace Juror No. 11 with the first alternate juror. Defense counsel asked the trial court if it would consider "reiterating certain instructions that direct them to consider the evidence and the law and nothing else beyond that." The trial court agreed and said that once the alternate juror was seated, it would instruct the jury that it was to begin its deliberations anew and at that time give the jury "other instructions."

24

The trial court then brought Juror No. 11 back to the courtroom. The trial court explained: "[I]n considering the matter—I appreciate your explanation, and I believe what you're telling me that you can—that you can decide the case based on the evidence alone. The problem is the fact that it was not brought up during jury selection—a problem because it could have caused one side or the other to have exercised a peremptory challenge for example . . . . [¶] . . . [¶] . . . to excuse you. And so there's an issue here, a fairness issue to the parties involved here. [¶] Even though you're able to put it aside and decide the case based on the evidence, and I think you'd be a great juror, especially based on your explanation, I'm going to have to dismiss you."

Following a recess, Simpson's trial counsel raised concerns about some of the issues raised by Juror No. 11, such as other jurors "reaching beyond the boundaries of . . . the evidence" and "bartering going on between unidentified jurors and the whole panel." Simpson's trial counsel stated that he believed that Juror No. 11's statements "could be a basis [for] a new trial motion." With respect to the trial court's dismissal of Juror No. 11, Simpson's trial counsel commented, "I don't disagree with the basis upon which she was excused. She didn't tell us the entire—her entire background about her son; and, therefore, no matter how she felt beyond that, that was the basis to be excused."

The trial court responded that Juror No. 11 should not have revealed information about the jury's deliberative process. The trial court, however, noted that Simpson's trial counsel could have grounds for a motion for a new trial depending on the jury's verdict and whether *additional* information about the jury's deliberations came to light. The trial court stated: "[I]f, after the verdict comes in, you talked to some jurors and they say, oh, we based this decision on a negotiation on this count versus this count, you know, maybe you'll have grounds for a new trial, but that's not where we are at this point."

Subsequently, the trial court individually asked each of the remaining jurors whether Juror No. 11's disclosures were "affecting [their] ability to deliberate on the facts

25

of [the] case and the evidence that [they] heard." Each of the remaining jurors answered no.

The trial court then seated the alternate juror and instructed the jury to "begin [their] deliberations again from the beginning" and "set aside and disregard all past deliberations." The trial court also stated, "I also want to emphasize to you that each of the counts in this case is a separate crime. So you must consider each count separately and return a separate verdict for each count; okay?"

### 2. *The Trial Court's Excusal of Juror No. 11*

#### a. *General Legal Principles*

Section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of the alternate . . . ." "The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 820-821 (*Wilson*).) While we review a trial court's determination to discharge a juror for an abuse of discretion, "a juror's inability to perform as a juror must be shown as a 'demonstrable reality' [citation], which requires a 'stronger evidentiary showing than mere substantial evidence' . . . ." (*Id*. at p. 821.)

#### b. *Forfeiture*

Preliminarily, the Attorney General argues that Simpson forfeited his claim that Juror No. 11 was improperly discharged because he failed to object below.

We agree. As the California Supreme Court has observed, " ' "[n]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make

26

timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.) "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' " (*People v. Partida* (2005) 37 Cal.4th 428, 434.)

An objection to the trial court's discharge of a juror is generally required to preserve the issue for appeal. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16 ["As a general rule, a defendant may properly raise in this court a point involving a trial court's allegedly improper discharge of a juror only if he made the same point below."], overruled on a different point as stated in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118; *People v. Earp* (1999) 20 Cal.4th 826, 893 [failure to object on constitutional grounds to discharge of deliberating juror during the penalty phase forfeited issues on appeal].) At no point did Simpson expressly object to the trial court's discharge of Juror No. 11.

Simpson disagrees and argues that the colloquy between the trial court and his trial counsel during the hearing on Juror No. 11's possible bias reflects that the trial court clearly understood the point that trial counsel was making, which was an objection. Moreover, he claims that the trial court interrupted his trial counsel's statements, which effectively deprived him of a chance to react, precluding application of the forfeiture doctrine.[4] (See *In re Khonsavanh S*. (1998) 67 Cal.App.4th 532, 537 [declining to apply

---

[4] During the hearing, after Juror No. 11 spoke about her failure to disclose her personal experiences, Simpson's trial counsel stated, "Well, and just for the record, I think she's adequately expressed a view that—that is not—her experience with her son is not overwhelming or causing her to—and, granted, he may well have [*sic*]." The trial court responded: "I agree with you, Counsel. I absolutely agree with you. I think she explained it away adequately as far as I'm concerned that it's not affecting her ability to (continued)

27

waiver doctrine where record reflects that trial counsel was "utterly surprised" by the trial court's ruling and had no opportunity to react].)

However, even if the trial court interjected and made a statement before trial counsel could make an objection, there is no reason why counsel could not have objected *after* the trial court completed its comments. Moreover, trial counsel's statements at the hearing do not constitute an objection to the trial court's discharge of Juror No. 11. Trial counsel's assertion that he believed that Juror No. 11's explanation was adequate did not alert the trial court to the fact that Simpson wanted Juror No. 11 to stay on the jury or that Simpson believed that discharging Juror No. 11 would be legally erroneous. And when trial resumed after a lunch break, trial counsel commented to the court, "I don't disagree with the basis upon which [Juror No. 11] was excused. She didn't tell us the entire—her entire background about her son; and, therefore, no matter how she felt beyond that, that was the basis to be excused."

Simpson's argument that his failure to object should be excused because an objection would have been futile (see *People v. Hill* (1998) 17 Cal.4th 800, 820 [a defendant is excused from making timely objection if doing so would have been futile]) is also based on speculation. The record does not reflect that the trial court would not have given an objection due consideration.

Finally, Simpson argues that should we find that he failed to make the necessary objection below, we should exercise our discretion to reach his claim because he raises an important constitutional issue and the issue affects his substantial rights. (See *People v. Denard* (2015) 242 Cal.App.4th 1012, 1020 [exercising discretion to reach claim of error

deliberate on the evidence." The trial court then stated that it believed that there was no doubt that the prosecutor would have challenged Juror No. 11 if she had previously disclosed information about her experience with her son.

under *Griffin v. California* (1965) 380 U.S. 609 despite failure to object in the trial court].)

However, even if we assume that Simpson's claim was not forfeited and the trial court erred when it discharged Juror No. 11, Simpson cannot demonstrate the required prejudice, as we explain below.

### c. *Prejudice*

The People concede that the trial court applied a legally erroneous standard when it discharged Juror No. 11. The comments made by the trial court at the hearing indicate that it found that Juror No. 11's experience with her son was not affecting her ability to deliberate and that her concealment was unintentional.[5] Thus, her inability to perform as a juror was not a " 'demonstrable reality.' " (*Wilson*, *supra*, 44 Cal.4th at p. 821.)

Simpson argues that if we find that the trial court erred when discharging Juror No. 11, we have no choice to but to reverse his convictions. In other words, Simpson claims that the trial court's allegedly erroneous discharge was structural error and requires automatic reversal of the judgment with no examination of prejudice.

We disagree. "An error is ' "structural," and thus subject to automatic reversal, only in a "very limited class of cases," ' such as the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction. [Citation.] What unites this class of errors is 'a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.". . . Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . .

---

[5] In *People v. Price* (1991) 1 Cal.4th 324, 400-401, the California Supreme Court held that a juror's intentional concealment of information in voir dire can establish "substantial grounds for inferring that [a juror] was biased against the prosecution."

and no criminal punishment may be regarded as fundamentally fair." ' " (*People v. Mil* (2012) 53 Cal.4th 400, 410.)

"The fact that an error implicates important constitutional rights does not necessarily make it structural. 'Many statutes . . . set out procedures designed to protect constitutional principles. Broadly construed, many of these procedural statutes may be said to protect due process and other constitutional safeguards. Nevertheless, most procedural shortcomings constitute trial error' and not structural error." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 178-179.)

Here, the trial court erroneously discharged a juror, and an alternate juror—who was vetted and approved by both parties—was sworn in, and the jury was instructed to begin deliberations anew. Simpson does not complain that the alternate juror was not impartial. Thus, the error complained of does not appear to " 'go to the very construction of the trial mechanism' " amounting to structural error. (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.)

Simpson's claim that the trial court's discharge of Juror No. 11 is structural error is largely premised on cases like *Wilson*, *supra*, 44 Cal.4th 758. *Wilson*, however, did not hold that the erroneous discharge of a juror was structural error. Rather, *Wilson* merely stated that "we have no choice but to reverse the penalty verdict." (*Wilson*, *supra*, 44 Cal.4th at p. 841.) Several other California Supreme Court cases have reversed the judgment after the erroneous removal of a deliberating juror, but, like in *Wilson*, these cases did not determine that the error was structural and reversal was required in every case. (See *People v. Cleveland* (2001) 25 Cal.4th 466, 486 (*Cleveland*); *People v. Armstrong* (2016) 1 Cal.5th 432, 454 (*Armstrong*).)

Having concluded that the error is not structural error, we must determine what standard of prejudice applies. The Attorney General argues in his supplemental brief that the standard of harmless error described in *People v. Watson* (1956) 46 Cal.2d 818

30

(*Watson*) applies, citing to cases like *People v. Bowers* (2001) 87 Cal.App.4th 722 (*Bowers*).[6]

In *Bowers*, *supra*, 87 Cal.App.4th 722, the Third Appellate District applied the *Watson* standard of review and determined that the trial court's erroneous discharge of a juror under section 1089 was prejudicial. (*Bowers*, *supra*, at pp. 735-736.) The record in *Bowers* strongly suggested that the discharged juror was the "lone holdout juror who steadfastly held to his belief defendant was not guilty throughout the course of deliberations and until he was discharged." (*Ibid*.) Therefore, the Court of Appeal reasoned that it was reasonably probable that had the juror remained on the panel, the case would have ended in a mistrial—a more favorable result for the defendant than a conviction. (*Id*. at p. 736; see also *People v. Barton* (2020) 56 Cal.App.5th 496, 516 (*Barton*) [applying *Watson* standard to trial court's erroneous discharge of juror].)

Simpson argues that we should apply the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 because "the error implicates the federal constitutional rights to a unanimous verdict and an impartial jury." Simpson's argument is supported by dicta in *Armstrong*, *supra*, 1 Cal.5th at page 454, where the California Supreme Court cautioned that "removal of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury."[7] However, after examining the

---

[6] The Attorney General also relies on *People v. Hem* (2019) 31 Cal.App.5th 218. *Hem*, however, concludes that when evaluating a claim of *jury misconduct*, misconduct " 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct.' " (*Id.* at p. 230.) A claim of jury misconduct is distinct from a trial court's erroneous discharge of a deliberating juror under section 1089.

[7] A recent United States Supreme Court decision made clear that the federal constitution's "Sixth Amendment's right to a jury trial requires a unanimous verdict to (continued)

constitutional rights at stake, we do not find that the trial court's error infringed upon Simpson's rights to a unanimous verdict or an impartial jury.

Discharging a deliberating juror without instructing the jury to begin deliberations anew can implicate the constitutional right to a unanimous verdict. (*People v. Collins* (1976) 17 Cal.3d 687, 692-693 (*Collins*), superseded by statute on another ground as stated in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.) The essential element of a trial by jury includes "that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous." (*Collins*, *supra*, at p. 693.) "The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them." (*Ibid*.)

Discharging a deliberating juror because of his or her view on the sufficiency of the evidence can also implicate the constitutional right to an impartial jury and "raise[] the specter of the government coercing a guilty verdict by infringing on an accused's constitutional right to a unanimous jury decision." (*Cleveland*, *supra*, 25 Cal.4th at p. 487 (conc. opn. of Werdegar, J); see *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 [discharging a sitting juror "may upset the delicate balance of deliberations"]; *United States v. Symington* (9th Cir. 1999) 195 F.3d 1080, 1085 [" 'To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict.' "]; *United States v. Christensen* (9th Cir. 2016) 828 F.3d 763, 807 [discharging juror based on views on sufficiency of evidence "violates a defendant's Sixth Amendment right to a unanimous verdict from an impartial jury"].)

However, "a defendant's right to a fair and impartial jury does not entitle him to a jury composed of particular individuals." (*People v. Thomas* (1990) 218 Cal.App.3d

---

support a conviction in federal court, [and] it requires no less in state court." (*Ramos v. Louisiana* (2020) __ U.S. __, __ [140 S.Ct. 1390, 1397] [2020 U.S. Lexis 2407].)

32

1477, 1486 (*Thomas*).) " '[W]here an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby.' [Citation.] This is so because alternate jurors are selected at the same time, are subject to the same qualifications and take the same oath as regular jurors. They hear the same evidence and are bound by the same rules and instructions as the regular jurors, and until the verdict is rendered they are at all times available and qualified to participate as regular jurors." (*Ibid.*)

In this case, Simpson's right to a unanimous verdict was preserved because the jury was instructed to begin deliberations anew after Juror No. 11 was discharged and the alternate juror was sworn in, and the 12-person jury subsequently deliberated and returned a verdict through deliberations "which [were] the common experience of all of them."[8] (*Collins*, *supra*, 17 Cal.3d at p. 693.) Additionally, Simpson's right to an impartial jury was not implicated because the trial court did not "coerc[e] a guilty verdict" by discharging Juror No. 11 based on her view of the evidence; the error arose from the trial court's mistaken belief that discharging Juror No. 11 was required out of fairness to the prosecutor, who would have challenged Juror No. 11 had she disclosed her son's experience during jury selection. (*Cleveland*, *supra*, 25 Cal.4th at p. 487 (conc. opn. of Werdegar, J.).) Accordingly, the trial court's error was not of federal constitutional dimension, and we find that under the circumstances here the *Watson*

_____

[8] The trial court advised the jury as follows: "[O]ne of your fellow jurors has been excused and an alternate juror has been selected to join the jury. Do not consider this substitution for any purpose. The alternate juror must participate fully in the deliberations that lead to any verdict. [¶] The People and the defendant have the right to a verdict reached only after full participation of the jurors whose votes determine that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place; okay?"

standard of prejudice applies. Thus, we examine whether it is reasonably probable that absent the error, Simpson would have received a more favorable verdict. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

In cases where courts have found prejudicial error from the improper discharge of a juror, the evidence clearly showed that the discharged juror viewed the evidence in a way that favored one side. For example, in *Bowers*, the record strongly suggested that the discharged juror was "the lone holdout juror" that steadfastly believed that the defendant was not guilty. (*Bowers*, *supra*, 87 Cal.App.4th at p. 735.) The other jurors reported that the discharged juror stated that he did not believe the witnesses that had testified. (*Id.* at p. 732; see also *Barton*, *supra*, 56 Cal.App.5th at p. 516 [discharged juror "was the lone holdout juror who consistently held to her belief Barton was not guilty"].) Likewise, in *Cleveland*, *supra*, 25 Cal.4th 466, the record reflected that the discharged juror did not believe there was " 'any evidence to support that the defendant allegedly came in and was attempting to get the weapon that allegedly was behind the counter underneath the cash register.' " (*Id.* at p. 486.) And in *Wilson*, *supra*, 44 Cal.4th 758, the discharged juror explained to other jurors that he was holding out for a life sentence. (*Id.* at p. 814.)

In *Armstrong*, other jurors reported that the discharged juror had a possible bias toward gang members and police. (*Armstrong*, *supra*, 1 Cal.5th at p. 444.) The jury foreperson said that the other jurors did not get much input from the discharged juror and the other jurors " 'would start to feel sort of a consensus going and then . . . would somehow just try to integrate [the excused juror] into the conversation,' " but the discharged juror seemed " 'a little less open minded.' " (*Id.* at p. 446.) The foreperson also stated, " '[O]ur discussions don't hold any water with her as well as our different means to determine the truth in this . . . .' " (*Id.* at p. 447.) Another juror said that the discharged juror had been participating but that she had " 'already made a conclusion' "

34

about the evidence. (*Id.* at p. 447.) The discharged juror, however, indicated to the trial court that she had been freely discussing the evidence with other jurors. (*Id.* at p. 451.) Based on the record, *Armstrong* concluded that it was "apparent from the record . . . that while deliberating with the other jurors, [the discharged juror] reached a conclusion regarding the strength of the prosecution's case and refused to change her mind." (*Id.* at p. 453.) Thus, *Armstrong* concluded that the error was prejudicial and reversed the judgment. (*Id.* at p. 454.)

Like *Armstrong*, there is some evidence that the other jurors had concerns about Juror No. 11. Juror No. 2 said that it seemed that Juror No. 11 did not want to believe the "predatory profiling" against Simpson, and she ignored "the other side of the evidence" like "the information that the D.A." provided. Multiple jurors indicated that they believed that Juror No. 11 was having a difficult time reaching a decision. Juror No. 2 said that Juror No. 11 divulged that the allegations against her son destroyed his life, she was having difficulty "making a decision and evaluating the evidence," and several jurors were concerned with how Juror No. 11 could evaluate the evidence without " 'carrying her baggage.' " Juror No. 1 said that it seemed that Juror No. 11 had some "frustration" and her experience with her son was "coloring her ability to decide" the case. Juror No. 1 also said that he believed that Juror No. 11 had a "degree of hesitation" about the case that was "impacting a few of the other jurors as well," and, although Juror No. 11's experience was "not necessarily affecting her ability to deliberate," he thought that Juror No. 11 was "intractable."

Unlike *Armstrong*, however, it is not "apparent from the record . . . [that Juror No. 11] reached a conclusion regarding the strength of the prosecution's case and refused to change [her] mind." (*Armstrong*, *supra*, 1 Cal.5th at p. 453.) When asked by the trial court if her experience with her son was "affecting [her] ability to deliberate on the evidence," Juror No. 11 answered "[n]o," and "I'm trying to stay on the evidence." Juror

35

No. 11 also said that she was evaluating the testimony of everyone who was involved, and she believed that they were supposed to be "evaluating whatever the D.A. brought as evidence and that testimony solely . . . ." Juror No. 11 maintained that she was evaluating the evidence that was presented and she believed that the jury must "evaluate the five counts" charged against Simpson "[b]ased on the testimony" that was admitted at trial. Juror No. 11 reiterated that she wanted the other jurors to "[b]ring it back to the case." Juror No. 11 stated, "This is a big decision to me, not guilty versus guilty," and she "want[ed] to make the right decision." As we previously noted, Juror No. 1 stated that he believed that Juror No. 11's experience was "not necessarily affecting her ability to deliberate," which was corroborated by Juror No. 11's comments that she was not being affected by her son's experience and she was "trying to stay on the evidence." The record does not reflect that Juror No. 11 had " 'already made a conclusion' " about the evidence. (*Id.* at p. 447.)

Moreover, Juror No. 11 was discharged after approximately two days of deliberations.[9] After the alternate juror was sworn in, the record reflects that the reconstituted jury deliberated for another two days before it reached a decision.[10] This is not a situation where a verdict was reached shortly after a juror was discharged and an alternate was sworn in. (See *Bowers*, *supra*, 87 Cal.App.4th at p. 736 [observing that "after less than one day of deliberation the new jury returned verdicts of guilty"].) As in *Thomas*, the alternate juror was approved by both parties, subject to the same

---

[9] The original jury began its deliberations during the afternoon on October 5, 2017. The jury resumed deliberations on October 10, 2017. The jury deliberated again on October 11, 2017 and resumed deliberations on October 12, 2017.

[10] Juror No. 11 was discharged on October 12, 2017. The reconstituted jury began deliberations that afternoon. The jury resumed deliberations on the morning of (continued)

36

qualifications as the other jurors, took the same oath, and heard the same evidence. (*Thomas*, *supra*, 218 Cal.App.3d at p. 1486.) Thus, Simpson "bears a heavy burden to demonstrate that he was somehow harmed" by the substitution. (*Ibid*.)

"[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error. [Citation.] Prejudice under *Watson* 'must necessarily be based upon reasonable probabilities rather than upon mere possibilities.' " (*People v. Mena* (2012) 54 Cal.4th 146, 162.) After a careful review of the record, we conclude that the record does not demonstrate that Juror No. 11 was a holdout juror or that she viewed the evidence in Simpson's favor; thus, it is not reasonably probable that had Juror No. 11 remained on the jury, Simpson would have received a more favorable verdict. (*Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

3. ***Inquiry into Jury Misconduct***

i. ***Mid-deliberation Inquiry into Juror Misconduct***

a. ***Background***

When the trial court questioned Juror No. 11 about her experience with her son, Juror No. 11 explained that the other jurors "were not just taking the testimony," they were "taking what they thought was like, pedophile—like a situation with a pedophile and trying to take that and make that like what was happening." Later, Juror No. 11 commented: "And let me tell you another thing that's very frustrating. Is last night when we were in the deliberation, one person said that they would be comfortable with us saying that he was guilty on two charges if we didn't agree on the other three. And I don't want to feel that kind of pressure that he's guilty on two charges because we don't want to let him go. That's the pressure we're feeling in there."

---

October 16, 2017, and deliberated the rest of the day. The jury continued their deliberations on October 17, 2017, and reached a decision that afternoon.

37

b. *General Legal Principles*

"[A]n important element of trial by jury is the conduct of deliberation in secret, free from ' " 'intrusive inquiry into the sanctity of jurors' thought processes.' [Citation.]" ' [Citation.] Secrecy affords the jurors the freedom to engage in frank discussions, free from fear of exposure to the parties, to other participants in the trial, and to the public." (*People v. Engelman* (2002) 28 Cal.4th 436, 442 (*Engelman*).) The California Supreme Court, however, has "recognized that the secrecy of deliberations 'may give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 569, quoting *Engelman*, *supra*, 28 Cal.4th at p. 443.) Thus, the Supreme Court has held that the trial court must hold "an inquiry sufficient to determine the facts" once it has "notice that good cause to discharge a juror may exist." (*People v. Burgener* (1986) 41 Cal.3d 505, 519 (*Burgener*), disapproved of on another ground as stated in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)

However, " 'not every incident involving a juror's conduct requires or warrants further investigation.' [Citation.] 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his [or her] duties and would justify his [or her] removal from the case.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 53 (*Manibusan*); see *People v. Ray* (1996) 13 Cal.4th 313, 342-344 [trial court did not abuse its discretion when it did not make a further inquiry after receiving note that juror knew daughter of victim from school because note indicated that juror did not talk with the daughter about the case];

*People v*. *Kaurish* (1990) 52 Cal.3d 648, 694 [no hearing required when juror made derogatory remark directed toward defense counsel absent inference that remark was result of improper or external influences].)

As the reviewing court, our inquiry focuses not on whether "there is uncertainty in the record concerning what occurred because the trial court did not conduct an inquiry," but "whether the information the trial court was aware of when it made its decision warranted further inquiry." (*People v*. *Fuiava* (2012) 53 Cal.4th 622, 703 (*Fuiava*).) And when misconduct by a juror has occurred, the misconduct " ' "usually raises a rebuttable 'presumption' of prejudice." ' " (*People v*. *Loker* (2008) 44 Cal.4th 691, 746-747.) Jury misconduct can be rebutted by an affirmative showing that prejudice does not exist or by a reviewing court's examination of the record to determine whether there is a reasonable probability of actual harm resulting from the misconduct. (*People v*. *Lavender* (2014) 60 Cal.4th 679, 687.) "[G]enerally a reminder to the jury of its duties . . . is 'strong evidence that prejudice does not exist.' " (*People v*. *Hem* (2019) 31 Cal.App.5th 218, 230 (*Hem*).)

### c. *Analysis*

Simpson argues that Juror No. 11's comments alerted the trial court that juror misconduct had occurred, and the trial court thus erred when it declined to make a further inquiry into the matter.

Simpson relies on *Hem*, *supra*, 31 Cal.App.5th 218. In *Hem*, an attorney prepared a note that stated that she overheard three jurors discuss the trial in the hallway inside the courthouse, and the three jurors mentioned that they were worried about " 'letting [the defendant] out so he could kill someone else's kid' " and discussed a juror note and stated that " 'they could otherwise live with the manslaughter' " depending on the trial court's answer to a juror note about second degree murder and manslaughter. (*Id.* at p. 222.) The prosecutor stated that she accepted the attorney's recitation of what had happened,

39

and the trial court stated that it accepted the attorney's account as an officer of the court "with 'the highest integrity.' " (*Id.* at p. 223.) Defense counsel argued that there was juror misconduct, but the trial court asserted that this was the type of misconduct that could be cured by an admonition, denied a mistrial, and admonished the jury to deliberate as a group. (*Id.* at pp. 222-223.) Defense counsel later stated on the record that he wanted to renew his motion for a further inquiry in the juror misconduct, but the trial court reiterated that it believed that the admonition it had given was sufficient and there was no evidence that the misconduct had been repeated. (*Id.* at p. 223.)

On appeal, the *Hem* defendant argued that the trial court should have made an inquiry to determine the scope of the juror misconduct, and because the scope of the misconduct was unknown, the People could not dispel the presumption of prejudice that arose when the jurors violated their oaths. (*Hem*, *supra*, 31 Cal.App.5th at p. 225.) The Court of Appeal recognized an evidentiary hearing on the truth or falsity of jury misconduct should not be a " 'fishing expedition,' " but found that in the case before it there was no dispute that misconduct occurred—what was disputed was the extent of the misconduct and an inquiry was necessary to preserve the defendant's right to a fair jury trial. (*Hem*, *supra*, at p. 227.) Thus, *Hem* concluded that the trial court's failure to inquire into the misconduct did not satisfy its duty to ensure the deliberations were proceeding properly or preserve the defendant's fundamental right to a fair jury trial. (*Id.* at p. 229.)

We find *Hem* is distinguishable. In *Hem*, it was *undisputed* that misconduct occurred—several jurors were overheard discussing the case by themselves outside of the deliberation room in contravention of the trial court's orders. (*Hem*, *supra*, 31 Cal.App.5th at p. 227.) Here, in contrast, the only evidence of misconduct that was

40

before the trial court was Juror No. 11's vague comments about the jury's deliberation process.[11]

First, Juror No. 11's comment that jurors were "taking what they thought was like, pedophile—like a situation with a pedophile and trying to take that and make that like what was happening" did not indicate that deliberating jurors were erroneously considering extrinsic evidence. "A juror commits misconduct if the juror conducts an independent investigation of the facts [citation], brings outside evidence into the jury room [citation], injects the juror's own expertise into the deliberations [citation], or engages in an experiment that produces new evidence . . . ." (*Wilson*, *supra*, 44 Cal.4th at p. 829.) However, jurors "bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience." (*People v. Marshall* (1990) 50 Cal.3d 907, 950.) The term "pedophile" is likely one that jurors, including Juror No. 11, were familiar with from their everyday life. Juror No. 11's comments did not indicate that the jurors were considering extrinsic evidence about "pedophiles" in their deliberations.

Juror No. 11 also did not state that the jury was engaged in vote trading. (See *People v. Guzman* (1977) 66 Cal.App.3d 549, 556 [one juror's proposal that the jury barter an acquittal of a codefendant for the conviction of the defendant was misconduct].) Juror No. 11 merely recounted that one juror stated that he or she "would be comfortable with us saying that he was guilty on two charges if we didn't agree on the other three."

---

[11] We observe that Juror No. 11's comments appear to recount statements made by other jurors. As we explain in further detail in the next section of the opinion, *post*, Evidence Code section 1150, subdivision (a) permits only "any otherwise admissible evidence" of statements made to demonstrate that the verdict may have been the result of juror misconduct. "[T]he provisions of Evidence Code section 1150 apply only to the postverdict situation and not to an inquiry conducted during jury deliberations." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

41

Juror No. 11 did not say that any jurors expressed a willingness to trade a not guilty vote on some counts in exchange for other jurors' guilty votes. Moreover, to the extent that Juror No. 11's comments reflected that other jurors may have been pressuring others to reach a decision, such disagreements do not amount to misconduct. In *People v. Keenan* (1988) 46 Cal.3d 478, the California Supreme Court upheld the denial of a new trial motion on the grounds of alleged juror misconduct based on an allegation that a juror "lost his temper," "pointed a finger" at the lone holdout juror, and stated that he was going to "kill" the holdout juror. (*Id.* at p. 540.) *Keenan* determined that even if the alleged threat occurred, no prejudicial misconduct occurred because the threat "was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist." (*Id.* at p. 541.) Moreover, " '[j]urors may be expected to disagree during deliberations, even at times in heated fashion.' Thus, '[t]o permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression.' " (*Ibid.*)

Juror No. 11's statements also did not reflect that the jury was improperly considering punishment during deliberations. Generally, "it is settled that punishment should not enter into the jury's deliberations." (*Engelman*, *supra*, 28 Cal.4th at p. 442.) Juror No. 11, however, stated that *she* did not want to feel "that kind of pressure that he's guilty on two charges because we don't want to let him go." Juror No. 11, however, was subsequently discharged from the jury.

We do not believe that the *only* reasonable inference from Juror No. 11's statements is that the jurors were engaging in misconduct. Simpson's arguments are no more than speculation—that further inquiry may have divulged that the jury was using extrinsic information about pedophilia in their deliberations, or that another juror actually stated that he or she would trade guilty votes for not guilty votes. The trial court reasonably found that Juror No. 11's ambiguous comments were insufficient to provide

42

"notice that good cause to discharge a[nother] juror may exist." (*Burgener*, *supra*, 41 Cal.3d at p. 519.)  Whether to conduct an inquiry during deliberations rests within the trial court's discretion, and in this instance, we find that the trial court's decision was not irrational, arbitrary, or capricious.[12]  (*Manibusan*, *supra*, 58 Cal.4th at p. 53.)

### ii.   *Postverdict Motion for New Trial on Grounds of Jury Misconduct*

#### a.  *Background*

After the jury reached its verdict, Simpson retained a new attorney and filed a motion for a new trial.  In support of his motion, Simpson attached a declaration prepared by a defense investigator who interviewed several of the jurors, including Juror No. 11, who had been excused before the jury reached its verdict, and Juror D.H.  According to the investigator, Juror No. 11 said that Juror No. 2 "made a comment that she was okay with voting not guilty on some counts as long as the jurors voted guilty on some other counts."  The defense investigator recounted that Juror No. 11 said that several jurors had concerns that Simpson worked around children because they believed he was a "pedophile."  The defense investigator also spoke with Juror D.H.  According to the defense investigator, Juror D.H. said that Juror No. 2 "seemed to want to strike a bargain" between the jurors, and she said that if the jurors "agreed to vote guilty on some counts," they could "vote not guilty on other counts."  Juror No. 11 and Juror D.H. did not submit their own declarations.

---

[12] Additionally, the jury that reached the verdict in this case was not the jury accused of misconduct.  After Juror No. 11 was excused, an alternate juror was sworn in and the jury was instructed to begin deliberations anew—to disregard prior deliberations and to start as if deliberations had never taken place.  The jury was also instructed to consider each count separately.  There is nothing to suggest that the reconstituted jury did not follow the trial court's instructions or that it did not take the trial court's admonition seriously.  (See *Fuiava*, *supra*, 53 Cal.4th at p. 716 ["[w]e presume the reconstituted juries followed the trial court's instructions to begin the deliberations anew"].)

Juror G.E. prepared a declaration. Juror G.E. stated that the jurors labeled Simpson as "opportunistic" during deliberations, and at least one juror used the word "pedophile" when talking about Simpson.

Juror L.H. also prepared a declaration. Juror L.H. stated: "The jurors discussed what is to stop Mr. Simpson from doing this again, because he still works at the church camp. He will still be around children, if Mr. Simpson is found not guilty." According to Juror L.H., the jurors also used the term "predatory behavior" during deliberations.

The trial court denied the motion for a new trial without holding an evidentiary hearing on the jury misconduct issues. The prosecutor asked, "Is the Court finding, based on the evidence that's been [no] need for a hearing on either of those two issues [including the juror misconduct issue]?" (*Sic.*) The trial court responded, "Yes." The trial court made no additional findings about Simpson's allegations of juror misconduct.

b. *General Legal Principles*

"The trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct." (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).) The trial court should hold a hearing only if the defense has come forward with evidence demonstrating " ' "a strong possibility that prejudicial misconduct has occurred." ' " (*Ibid.*) And even if such a showing is made, an evidentiary hearing is not necessary unless the trial court concludes that the hearing is " 'necessary to resolve material, disputed issues of fact.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604 (*Avila*).)

"Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1256 (*Hayes*); see also *Manibusan*, *supra*, 58 Cal.4th at p. 55.) In *Hayes*, the California Supreme Court found no abuse of discretion in the trial court's denial of a new trial motion that was based on statements made by defense counsel and a defense investigator

44

that recounted a juror's out-of-court statement. (*Hayes*, *supra*, at pp. 1256-1257.) Likewise, in *Dykes*, *supra*, 46 Cal.4th 731, the Supreme Court held that "ordinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay." (*Id.* at p. 810.) The only evidence of juror misconduct in *Dykes* was the hearsay statements of jurors that were relayed to the defense investigator. (*Dykes*, *supra*, at p. 807.) *Dykes* concluded that the trial court did not abuse its discretion in declining to hold an evidentiary hearing on the juror misconduct claims. (*Id.* at pp. 810-811.)

However, a juror's sworn declaration referencing overt acts or statements made by other jurors is admissible under Evidence Code section 1150. (*Manibusan*, *supra*, 58 Cal.4th at p. 55 [juror declaration referencing statement made by another juror was admissible].) Under Evidence Code section 1150, subdivision (a), the trial court may receive evidence of "statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly." Nevertheless, evidence as to how the statements, conduct, conditions, or events influenced a juror or affected the jurors' mental processes in reaching their verdict is inadmissible. (*Ibid.*)

Juror misconduct gives rise to a presumption of prejudice, "which may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct." (*People v. Lavender*, *supra*, 60 Cal.4th at p. 687.) "[A] trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct." (*Dykes*, *supra*, 46 Cal.4th at p. 809.)

45

" 'We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct.' " (*Avila*, *supra*, 38 Cal.4th at p. 604.)

### c. *Analysis*

Simpson argues that the mid-deliberation comments made by Juror No. 11 before the alternate juror was sworn in, the defense investigator declaration, and the juror declarations provided with the motion for new trial established that there was a strong possibility that juror misconduct occurred and the trial court erred by failing to hold an evidentiary hearing.

First, the defense investigator's declaration merely related hearsay from Juror No. 11 and Juror D.H., and the statements did not fall within any statutory exception and were not admissible evidence that could be used to inquire into the validity of the verdict. (*Hayes*, *supra*, 21 Cal.4th at p. 1256; Evid. Code, §§ 1200, subds. (a) & (b), 1150, subd. (a).) Juror No. 11 and Juror D.H. did not submit an affidavit or other admissible evidence of jury misconduct to the trial court.

Requiring an evidentiary hearing on the basis of unsworn hearsay statements "is tantamount to the type of 'fishing expedition' condemned [by our Supreme Court]. Either a juror is willing to come forward and, at least on a preliminary basis, sign an affidavit or not. Unless the reticence results from impermissible interference by the court or prosecutor, the reasons therefor should not be subject to further inquiry." (*People v. Cox* (1991) 53 Cal.3d 618, 699, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) In *Dykes*, *supra*, 46 Cal.4th 731, the only evidence of jury misconduct came from unsworn reports by the defense investigator, which contained statements of several jurors. (*Id*. at p. 806.) The *Dykes* court noted that the defendant had failed to offer a "persuasive basis" (*id*. at p. 811) for deviating from the general rule against hearsay as a basis for an evidentiary hearing and found that the defendant's

46

motion had not alleged "such serious misconduct that the court abused its discretion by declining to order an evidentiary hearing." (*Id*. at pp. 811-812.) As in *Dykes*, we do not believe that Juror No. 11's and Juror D.H.'s allegations, as contained in the defense investigator's declaration, were so serious as to provide a compelling reason to deviate from the rule against using hearsay as a basis for an evidentiary hearing regarding juror misconduct.[13]

Turning to the admissible evidence presented to the trial court—Juror No. 11's mid-deliberation statements, Juror G.E.'s declaration, and Juror L.E.'s declaration—we find that Simpson failed to come forward with evidence demonstrating " ' "a strong possibility that prejudicial misconduct has occurred." ' " (*Dykes*, *supra*, 46 Cal.4th at p. 809.)

First, a jury may not consider punishment in its deliberations. (*Engelman*, *supra*, 28 Cal.4th at p. 442.) The only admissible evidence before the trial court that the jury considered punishment was Juror No. 11's mid-deliberation statements and Juror L.H.'s declaration. As we previously explained, Juror No. 11 stated that *she* did not want to feel "that kind of pressure that he's guilty on two charges because we don't want to let him go." However, even if Juror No. 11's comments indicated that she was improperly considering punishment, she was subsequently discharged from the jury. Next, Juror L.H. stated that the jurors discussed "what is to stop" Simpson from "doing this again" should he be acquitted because "he still works at the church camp." Juror G.E., who also prepared a declaration, did not mention any discussion of punishment by the jury.

Simpson relies on *People v. Echavarria* (2017) 13 Cal.App.5th 1255 (*Echavarria*). In *Echavarria*, the defendant, who was convicted of first degree murder, filed a motion

---

[13] We also reiterate that Juror No. 11 and her observations of the deliberation process were confined to what she experienced *before* the alternate juror was seated and the jury was instructed to begin deliberations anew.

47

for a new trial on the ground of juror misconduct. (*Id*. at pp. 1262-1263.) Attached to the new trial motion was a declaration prepared by a juror who stated that a fellow juror had said that she had worked in a prison and that the defendant " 'could "walk tomorrow" with time served' if he were convicted of second degree murder." (*Id*. at p. 1262.) The trial court held an evidentiary hearing, and during the hearing, all 12 jurors testified. (*Ibid*.) Several jurors recounted that the jury discussed punishment during deliberations, one juror stated that another juror said that the defendant "might not be sufficiently punished unless he were convicted of first degree murder," and two jurors recalled that a fellow juror stated that "defendant may not be sufficiently punished if defendant were convicted of second degree murder." (*Id*. at p. 1263.) After the hearing, the trial court denied the defendant's new trial motion. (*Id*. at p. 1264.)

The *Echavarria* court noted that the extraneous information about sentencing occurred during the guilt phase of the proceedings, the information was presented by a person who appeared to have "some authority on the subject," and the discussion was "personal to defendant" and was "not an abstract discussion about prison credits." (*Echavarria*, *supra*, 13 Cal.App.5th at p. 1267.) After examining the evidence in the record, the *Echavarria* court held that "[t]he [juror's] statement about punishment, if it had been introduced at trial, would have necessitated reversal of the judgment"; therefore, the juror misconduct was "inherently prejudicial." (*Id*. at p. 1271.) Thus, the Court of Appeal reversed the judgment. (*Id*. at p. 1272.)

However, not all discussions of punishment constitute prejudicial juror misconduct. In *People v. Hord* (1993) 15 Cal.App.4th 711 (*Hord*), the Fifth Appellate District upheld the denial of a new trial motion without an evidentiary hearing after the defendant filed declarations from several jurors that indicated that the jury speculated about the defendant's possible sentence should he be found guilty. (*Id*. at pp. 721, 723-729.) One juror's declaration stated that " 'during the deliberations jurors were

48

speculating regarding how much time the defendant would receive based on a guilty verdict,' " and another juror's declaration stated that " 'several jurors also discussed what the defendant's possible sentence would be.' " (*Id*. at p. 721.) One juror specifically stated in his declaration that he could not recall a comment about the defendant's possible sentence, and three other jurors did not mention the sentencing discussion in their declarations. (*Id*. at p. 722.)

On appeal, the *Hord* defendant argued that the trial court erred in denying an evidentiary hearing on the juror misconduct issue and erred in denying the motion for a new trial. (*Hord*, *supra*, 15 Cal.App.4th at p. 723.) The Court of Appeal determined that the trial court did not err in denying an evidentiary hearing because the "truth of the material allegations was not in question," and the trial court accepted that the statements made by the jurors in the declaration were true and a discussion of sentencing had taken place during deliberations. (*Id*. at p. 724.)

The *Hord* court then examined whether the trial court erred in denying the motion for a new trial. *Hord* observed that the existence of juror misconduct raises the presumption of prejudice, but " '[t]he presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' " (*Hord*, *supra*, 15 Cal.App.4th at p. 725.) *Hord* then determined that "[w]hen jury deliberations have been infiltrated with a matter which is prohibited, one must look at the nature of what has improperly infiltrated the procedure and the possibility of prejudice." (*Id*. at p. 727.) "Where the misconduct is not 'inherently likely' to have affected the vote of any of the jurors, prejudice is not shown." (*Ibid*.) *Hord* concluded that although the defendant's possible sentence should not have been discussed, "the discussion was very different than when a juror performs experiments or brings in new law or facts into deliberations. The jury was obviously well aware here that defendant . . . would be

punished if the jury found him to be guilty.  Thus the comments did not interject any new material into deliberations that was not already known by the jury from the trial itself.  Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion.  The fact that only some of the jurors recalled the comments tends to indicate that this was not a discussion of any length or significance." (*Id*. at pp. 727-728.)  *Hord* concluded that when "comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases." (*Id*. at p. 728.)  For example, comments such as " 'we will have to find the defendant guilty of the greatest charges to ensure he will be adequately punished' . . . are more likely to influence that juror and other jurors." (*Ibid*.)

In *People v. Hill* (1992) 3 Cal.App.4th 16 (*Hill*), disapproved of on a different point as stated in *People v. Nesler* (1997) 16 Cal.4th 561, 582, footnote 5, the Third Appellate District upheld the trial court's denial of a new trial motion alleging juror misconduct after three jurors prepared declarations that stated that they had heard in deliberations that the defendant would "probably face only six months in jail" if convicted. (*Hill*, *supra*, at p. 26.)  *Hill* noted that "[i]t is also rare for jurors not to have some preconceived, and possibly ill-conceived, notion of the penalty associated with a particular crime.  To harbor these thoughts is not misconduct.  Only when a juror disregards an instruction and introduces these matters into the jury's deliberations does misconduct arise.  When this occurs prejudice depends upon the nature and source of the information as well as how the information relates to the issues at hand." (*Id*. at pp. 36-37.)

*Hill* concluded that the references to penalty made by the jurors "involved a matter not material to the issues presented to the jury." (*Hill*, *supra*, 3 Cal.App.4th at p. 37.)  *Hill* also determined that "[t]here is no evidence of a multilateral discussion of penalty

50

nor competent evidence that penalty was considered." (*Id.* at p. 38.) The evidence showed only "two or three isolated statements relating to penalty" that were "couched in terms merely of a probability that the defendant would receive a six-month jail sentence." (*Ibid.*) Accordingly, the Court of Appeal found that the statement about the defendant's sentence, which was "mere speculation by someone with no special knowledge of the subject," was not " 'inherently likely' [citation] to have affected the vote of any of the jurors." (*Ibid.*)

The trial court in this case did not expressly state its reasons for denying the evidentiary hearing on the issue of juror misconduct. Here, Juror L.H.'s declaration was uncontradicted, and the trial court could have reasonably concluded that an evidentiary hearing was not " 'necessary to resolve material, disputed issues of fact.' " (*Avila*, *supra*, 38 Cal.4th at p. 604.) Moreover, the trial court could have reasonably determined that assuming that the discussion described by Juror L.H. took place, Simpson did not " ' "come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." ' " (*Dykes*, *supra*, 46 Cal.4th at p. 809.)

The sole evidence presented by Simpson that the jurors discussed punishment came from the lone statement made in Juror L.H.'s declaration. Juror L.H. recounted that "[t]he jurors discussed what is to stop Mr. Simpson from doing this again, because he still works at the church camp" and "[h]e will still be around children, if Mr. Simpson is found not guilty," but she did not say that the issue was debated at length. Juror L.H. also did not specify *when* the discussion about Simpson's possible punishment took place, such as if the discussion took place before or after Juror No. 11 was discharged and the jury was instructed to begin deliberations anew. Juror G.E.'s declaration did not mention that there were any discussions about punishment during deliberations.

Unlike in *Echavarria*, this is also not a situation where the evidence showed that the information about Simpson's possible punishment was presented by a person who

51

appeared to have "some authority on the subject." (*Echavarria*, *supra*, 13 Cal.App.5th at p. 1267.) Nor did Juror L.H.'s declaration suggest that the jurors discussed that Simpson needed to be convicted of a certain offense to be " 'adequately punished.' " (*Hord*, *supra*, 15 Cal.App.4th at p. 728; see also *Echavarria*, *supra*, at p. 1267.) Juror L.H.'s declaration demonstrated that the jurors engaged in an abstract discussion that Simpson would not be incarcerated if he was found not guilty. However, as discussed in *Hord*, the jury was "obviously well aware . . . that [Simpson] . . . would be punished" if he were found guilty, and the "comments did not interject any new material into deliberations that was not already known by the jury from the trial itself." (*Hord*, *supra*, 15 Cal.App.4th at p. 727.)

In this case, the evidence presented in Juror L.H.'s declaration did not describe misconduct that was " 'inherently likely' to have affected the vote of any of the jurors." (*Hord*, *supra*, 15 Cal.App.4th at p. 727; *Hill*, *supra*, 3 Cal.App.4th at p. 38.) "[A] trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct." (*Dykes*, *supra*, 46 Cal.4th at p. 809.) Accordingly, the trial court could reasonably conclude that the evidence presented by Simpson did not create a " ' "strong possibility that prejudicial misconduct occurred." ' " (*Ibid.*)

Second, the additional evidence provided in the jurors' declarations did not demonstrate that the jury improperly considered extrinsic evidence regarding pedophile profiles. (See *Wilson*, *supra*, 44 Cal.4th at p. 829 [jury verdict must rest solely on evidence presented at trial].) The only evidence was that the jury used the terms "pedophile" and "predatory behavior" several times during their deliberations. As we explained, the term "pedophile" is widely used, and it is likely a term that the jury was familiar with from their everyday life.

52

Finally, Juror No. 11's mid-deliberation statements did not indicate that jurors were impermissibly trading votes.

Accordingly, the trial court did not abuse its discretion in denying Simpson's motion for a new trial because of alleged juror misconduct without an evidentiary hearing. (*Hayes*, *supra*, 21 Cal.4th at pp. 1256-1257; *Dykes*, *supra*, 46 Cal.4th at pp. 810-811.)

## B. Admission of Statistical Testimony

Simpson argues that the trial court erred when it admitted testimony that suggested that false reports of child sexual abuse are statistically rare. He argues that if his trial counsel's failure to object to the evidence forfeits his appellate claim, counsel rendered ineffective assistance.

### 1. Background

Before trial, the prosecutor made a motion in limine seeking to exclude evidence of victim2's reputation for story-telling. During a pretrial hearing, the trial court ruled that the defense could elicit testimony from mother that victim2 sometimes told imaginative stories when she was a young child. The trial court, however, stated that "should the defense open that door," the prosecutor would be permitted to "ask their CSAAS expert regarding the false reporting regarding sexual assault cases." Simpson's trial counsel stated that he objected to the testimony "unless [the expert] can lay a foundation for it." The trial court agreed that a foundation had to be laid for any expert opinion.

During trial, the prosecutor asked Dr. Carmichael about studies into children's suggestibility. Simpson's trial counsel objected, arguing that Dr. Carmichael was "far afield from the subject matter of [his] expertise." The trial court overruled counsel's objection. Later, the prosecutor asked Dr. Carmichael about research into false allegations of child sexual assault. Dr. Carmichael testified that false allegations are

53

"quite rare," and "[p]ercentage wise, you're looking at zero to two and a half or four percent, or so, of false allegations made outside of that [child] custody arena. And even in some of those studies, none of them were made by kids." On cross-examination, Dr. Carmichael also testified that one critic of CSAAS wrote that "you can assume that most crimes of sexual abuse are true or valid."

### 2. *Forfeiture*

Simpson argues that his argument is not forfeited because he raised an objection to Dr. Carmichael's testimony during the hearing on the prosecutor's motion in limine. We disagree. Simpson's trial counsel objected to Dr. Carmichael's testimony twice—once during the hearing on the motion in limine and again when Dr. Carmichael testified—but the objections were not based on the specific grounds now urged on appeal, that the evidence was not relevant and invaded the province of the jury. (Evid. Code, § 353, subd. (a); *People v. Demetrulias* (2006) 39 Cal.4th 1, 22 [objection to evidence must be preserved by specific objection at time evidence was introduced] (*Demetrulias*).) During the hearing on the in limine motion, Simpson's trial counsel argued that he would object to Dr. Carmichael's testimony unless there was sufficient foundation for it. At trial, he similarly echoed his foundational objection—asserting that Dr. Carmichael was testifying on subjects outside his expertise. Simpson's failure to object on the specific grounds raised on appeal forfeits his appellate arguments.

### 3. *Ineffective Assistance of Counsel*

Alternatively, Simpson argues that his trial counsel was ineffective for failing to object to Dr. Carmichael's testimony about statistics and how one critic wrote that "you can assume that most crimes of sexual abuse are true or valid." Simpson relies on two recent appellate decisions that have concluded that admission of statistical testimony about false allegations of sexual abuse are inadmissible, *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, and *People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).

54

To prevail on an ineffective assistance of counsel claim, a defendant must establish that trial counsel's performance was deficient and that defendant suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id*. at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.)

First, the record sheds no light on why trial counsel objected to the evidence solely on the grounds that it lacked foundation or that it went beyond Dr. Carmichael's expertise. *Wilson* and *Julian* were decided in 2019, a year after Simpson's trial, and it was not yet established that such testimony was inadmissible for the grounds raised by Simpson on appeal. Furthermore, trial counsel may have also believed that he could address Dr. Carmichael's testimony about false allegations through cross-examination, which is what he attempted to do when he asked Dr. Carmichael about how false allegations are determined. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 506 [competent counsel may forego valid objection for tactical reason].)

During cross-examination, Simpson's trial counsel asked, "Would you agree that CSAAS acknowledges that there's no clinical method available to establish valid points from those that should be treated as fancy or deception?" Dr. Carmichael responded there is not a "tool or a measure or a single thing you can say that abuse happened." Dr. Carmichael, however, later reiterated that the population of children that make false allegations "are low," and the rates are "in that zero to two and a half and sometimes six percent range." Simpson's trial counsel asked, "How do you discern the two [false allegations and real abuse]?" Dr. Carmichael replied, "There's no tool that makes the

distinction. That's why you have the judicial process." Dr. Carmichael then stated that when he provides treatment to sexually abused children, there "has been a finding" that was already made that the child has been abused.

We acknowledge that trial counsel's cross-examination had the unintended effect of prompting Dr. Carmichael to repeat the irrelevant statistical evidence and to testify that a critic had written that "you can assume that most crimes of sexual abuse are true or valid." The record, however, reflects that trial counsel may have made the tactical decision to cross-examine Dr. Carmichael about the differences between false allegations and real abuse in order to emphasize that there is no tool that can make such a distinction—thereby undermining the basis of Dr. Carmichael's testimony about the low rate of false allegations. With the benefit of hindsight, an objection to the evidence may have been a preferable choice, but this is not a case where we can conceive of no tactical reason for trial counsel's omission. (*Strickland*, *supra*, 466 U.S. at p. 688 [ineffective assistance of counsel must require showing that counsel's representation fell below objective standard of reasonableness].)

Simpson also cannot demonstrate that had the challenged testimony been excluded, he would have received a more favorable result. (*Strickland*, *supra*, 466 U.S. at p. 694.) In *Julian*, the child victim gave conflicting testimony about the sexual abuse. (*Julian*, *supra*, 34 Cal.App.5th at pp. 881-882.) The child victim's siblings all testified that they never saw the defendant touch the child victim inappropriately. (*Id*. at p. 882.) In essence, the *Julian* case "was a credibility dispute between [the child victim's] testimony and [the defendant's testimony]." (*Id*. at p. 888.)

Here, the victims' prior statements and their trial testimonies consistently recounted that Simpson inappropriately touched them when they were younger. Although neither of the victims corroborated each other's allegations, both victims testified that their memories of the events were fragmented. Additionally, this case was

56

not simply a credibility contest between the victims and Simpson. The prosecution presented multiple witnesses, including mother, sister-in-law, J.G., C.A., and A.C.2, who testified that the victims had previously disclosed that Simpson had inappropriately touched them at various times. There was no evidence presented that indicated that the victims had any type of bias against Simpson or were motivated to fabricate their stories. Furthermore, Dr. Carmichael's references to the statistical testimony during trial were relatively brief, and the prosecutor did not refer to the statistical evidence during closing argument, further diminishing the likelihood of prejudice.

For these reasons, we find that Simpson has not met his burden to show that his trial counsel was constitutionally ineffective for failing to object to Dr. Carmichael's testimony.[14]

### C. *Failure to Present Defense Expert Testimony*

Next, Simpson argues that his convictions must be reversed because he was unable to present expert testimony from Dr. Ellen Stein. He argues that if Dr. Stein's failure to testify was due to his trial counsel's inadvertence, his counsel rendered ineffective assistance.

---

[14] In his opening brief, Simpson also argues that Detective Toomey's testimony that she was not familiar with research into false allegations of child sexual assaults was erroneously admitted under *Wilson* and *Julian*. Simpson, however, does not analyze Detective Toomey's statements aside from making a conclusory argument that her testimony was erroneous under *Wilson*. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) Even if the point was not waived, we fail to see how Detective Toomey's testimony that she was *not* familiar with research into false allegations was analogous to the statistical evidence deemed inadmissible in *Wilson* and *Julian*.

1. *Background*

On September 20, 2017, Simpson's trial counsel filed a motion in limine seeking to admit Dr. Stein's expert testimony. The motion stated that Dr. Stein would testify about "childhood suggestibility" and the "psychological factors involved in the interview process." The motion also stated that recent research had examined the "common problems presented by suggestive questioning of children." The People filed an opposition to Dr. Stein's testimony.

The following day, the trial court held a hearing on the parties' in limine motions. The trial court stated: "As I indicated, I'm skeptical about what the defense expert can offer in this case, but I've agreed to allow [Simpson's trial counsel] to obtain a statement from his expert as to exactly what she would testify to if called as a witness. And after reviewing that statement, I'll make a ruling." Simpson's trial counsel responded that he would do his "best" to have the statement ready by the next week. There is nothing in the record to reflect that Simpson's trial counsel submitted a statement summarizing Dr. Stein's proposed testimony, and Dr. Stein did not testify at Simpson's trial.

After the jury reached its verdict, Simpson's trial counsel prepared a declaration in support for a motion for a new trial. Counsel declared that he had to "scramble" to present a defense after the prosecution rested its case early, and he had attempted to get Dr. Stein to testify, but she was unable to reschedule her prior commitments. Trial counsel remembered that he had discussions with the trial court in chambers and "possibly on the record" about the admissibility of Dr. Stein's testimony, and he remembered that he argued that her testimony was admissible under *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*). Near the end of the prosecutor's case in chief, trial counsel asked the trial court if it would allow a continuance until Dr. Stein was available, but the trial court denied the continuance and excluded her testimony.

58

On June 14, 2018, the trial court held a hearing on Simpson's motion for a new trial. The trial court stated that it recalled that there had been a discussion with Simpson's trial counsel about preparing a statement from Dr. Stein summarizing her intended testimony but "[t]hat statement was never produced." The trial court explained that it had indicated that Dr. Stein could not testify about the subjects initially proffered by Simpson's trial counsel, but the trial court had been willing to "look at anything else [that trial counsel] wanted to submit," but "nothing was submitted." The trial court also stated that the other reason that Dr. Stein did not testify was because Simpson's trial counsel had a scheduling problem with Dr. Stein. The trial court explained that it had denied a continuance because it "had no indication of what [Dr. Stein] was going to testify to or whether her testimony was going to be relevant to any of the issues in the case or were admissible, for that matter."

### 2. *Simpson's Trial Counsel Did Not Call Dr. Stein as a Witness*

On appeal, Simpson argues that the trial court erred when it excluded Dr. Stein from testifying. Simpson's argument fails because the record reflects that the trial court did not exclude Dr. Stein's testimony; Simpson's trial counsel failed to produce her as a witness. The record reflects that the trial court asked trial counsel to prepare a statement summarizing Dr. Stein's proposed testimony so it could make a ruling on the admissibility of her testimony. Simpson's trial counsel agreed to do so, but no such statement appears in the record. Furthermore, there is no ruling on the record excluding Dr. Stein's proposed testimony.

### 3. *Ineffective Assistance of Counsel*

Simpson argues that if Dr. Stein did not testify due to his trial counsel's omissions, his trial counsel rendered ineffective assistance. This argument is virtually identical to his claim of ineffective assistance of counsel raised in his new trial motion, which the trial court denied.

59

Typically, a trial court has broad discretion when ruling on a new trial motion and its ruling will not usually be disturbed on appeal unless it has abused its discretion. (See *Fuiava*, *supra*, 53 Cal.4th at p. 730.) However, appellate courts have held that when the trial court has denied a motion for a new trial based on an ineffective assistance of counsel claim, which implicates a constitutional right, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts demonstrate a violation of the right to effective counsel. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

As we previously explained, to prevail on an ineffective assistance of counsel claim, a defendant must establish that trial counsel's performance was deficient and that defendant suffered prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id*. at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.)

The trial court did not make any express factual determinations about whether Simpson's trial counsel had a tactical reason for failing to call Dr. Stein as a witness. The trial court, however, determined that Simpson's trial counsel failed to produce a statement summarizing the contents of Dr. Stein's proposed testimony, and the trial court denied a continuance because it had no summary of Dr. Stein's proposed testimony. In his declaration in support of the new trial motion, Simpson's trial counsel did not claim that he had a tactical reason for failing to call Dr. Stein as a witness. In fact, Simpson's trial counsel characterized Dr. Stein's testimony as the "heart" of the defense.

60

Accordingly, the record "affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

Our inquiry does not end here. Reversal for ineffective assistance of counsel is required only if Simpson can demonstrate that he was prejudiced by his counsel's omissions and that it is reasonably probable that had Dr. Stein testified, he would have received a more favorable result. (*Strickland*, *supra*, 466 U.S. at p. 694.)

In support of Simpson's motion for a new trial, Dr. Stein submitted a declaration that summarized the contents of her intended testimony. Dr. Stein indicated that she understood that Simpson's trial counsel had wanted her to discuss three areas: (1) that there was no evidence that Simpson had a mental disorder that predisposed him to the commission of sexual offenses, either against children or adults; (2) that victim1 and victim2's conversations "outside the forensic interview process" with family and friends provided opportunities for "contamination"; and (3) that CSAAS is "commonly understood in forensic psychology to be 'junk science' and . . . is not scientifically supported through any peer reviewed studies."

First, we do not believe that failure to admit Dr. Stein's opinion that Simpson did not have a mental disorder predisposing him to committing sexual offenses was reversible error.

" 'It is now settled that psychological opinions based upon personal examination and an analysis of accepted psychological tests . . . may be admitted as character evidence tending to show that an individual was or was not likely to have committed a particular act.' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 567.) In *Stoll*, *supra*, 49 Cal.3d 1136, the California Supreme Court concluded that the trial court erroneously excluded evidence that the defendant displayed a " 'normal personality function,' " showed no " 'indications of deviancy,' " and implied that the defendant was " 'unlikely' " to commit the charged act or any serious crime. (*Id*. at p. 1153.)

61

The *Stoll* court found exclusion of similar evidence to be prejudicial but under much different circumstances. (*Stoll*, *supra*, 49 Cal.3d 1136.) In *Stoll*, four defendants were tried and convicted of 36 counts of lewd conduct against seven children. (*Id.* at p. 1141.) Two of the defendants attempted to introduce expert testimony that they did not have signs of sexual deviancy. (*Ibid.*) The California Supreme Court noted that the defendants had "mounted a thorough attack on the credibility of each witness." (*Id.* at p. 1162.) Several child witnesses contradicted each other's account of the same event. (*Ibid.*) Additionally, four of the children who testified against the defendants admitted that they had lied at the preliminary hearing, and two witnesses conceded that their trial testimonies "contained at least one untruth." (*Ibid.*) Pretrial statements of several of the children witnesses contradicted their trial testimony as to the type of, or circumstances surrounding, the sex crimes at issue. (*Ibid.*) Moreover, the investigators specifically directed three of the children "to discuss sexual contact with defendants," and two of the children were told about one of the other children's accusations before they were questioned. (*Ibid.*) Given these circumstances, the Supreme Court concluded that the "jury might well have been swayed by expert opinion testimony that neither [defendant] was 'the type of person' to commit the charged acts." (*Ibid.*)

Assuming Dr. Stein's testimony was admissible under *Stoll*, we do not find that failure to call her as a witness caused Simpson prejudice. Like in *Stoll*, there was no physical evidence to corroborate victim1 and victim2's claims. Nonetheless, the evidence in this case did not suffer from the deficiencies that were present in *Stoll*. The victims could not recall each other's accounts of abuse—for example, victim1 could not recall going to Simpson and wife's apartment in San Jose, and she could not recall a family trip to the beach. The victims, however, did not offer contradictory accounts of the events that occurred. Moreover, there was no evidence that they had lied or had been untruthful during the investigatory process. Additionally, several witnesses testified that

the victims had disclosed the abuse to them at various times. We do not believe that it is reasonably probable that the opinion of a defense-retained expert on Simpson's predisposition toward sexual deviancy would have led to a more favorable result.

Next, Dr. Stein's declaration stated that she anticipated giving testimony about the impact of suggestibility and contamination on the victims through improper and misleading questioning. Dr. Stein explained that she had examined transcripts of interviews with victim1 and victim2 and that in an interview with victim2, officers used "closed-ended" and "leading" questions which were "improper for a forensic interview of a child or adolescent."

Assuming the testimony was admissible, Simpson cannot demonstrate that he was prejudiced by its exclusion. Dr. Stein's declaration pointed to two short instances where officers used closed-ended and leading questions when interviewing victim1. First, an officer asked victim1 whether Simpson would use his hands "over [her] shirt," whether he would "go in through the neck," and whether he would "grab [her] butt" or "do anything specific" like "squeeze" or "just slide his hand back there." After victim1 replied that Simpson had slid his hands "back there," the officer asked whether Simpson's hands went "into [her] butt cheek," whether he "actually touch[ed] like [her] anus," and whether, after he "push[ed her] butt cheeks to the side," if he "ever put his fingers inside" victim1. Dr. Stein's declaration, however, stated that in the earlier portion of the *same* interview in question, officers used open-ended questions until victim1 described that Simpson would "slid[e] 'his hand down our [victim1's and victim2's] back[s] and then go under our [pants].' " Subsequently, the officer used closed-ended and leading questions to get some of the details about the inappropriate touching. In his opening brief, Simpson does not identify any other instances where suggestive questioning was used with either victim1 or victim2. Given that Dr. Stein's testimony would have only been relevant to these relatively brief instances where suggestive

63

questioning techniques were employed, and because the suggestive questioning at issue took place only *after* victim1 had described that Simpson slid his hands down her and victim2's pants, the evidence would not have been particularly probative.

Finally, Dr. Stein intended to offer rebuttal testimony about CSAAS. However, even if her testimony on this subject was admissible, Simpson cannot demonstrate that its omission caused him prejudice. The criticisms lodged by Dr. Stein against CSAAS that were described in her declaration were raised by Simpson's trial counsel when he cross-examined Dr. Carmichael. For example, on cross examination, Dr. Carmichael acknowledged that there were criticisms of CSAAS, CSAAS should not be used as a diagnostic tool, CSAAS was not a "scientific study," and CSAAS has not been accepted by the American Psychiatric Association's Diagnostic and Statistical Manual.

Relying on *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*), Simpson argues that the admission of evidence that impinges on a defendant's credibility is considered prejudicial in cases where the defendant's credibility is the pivotal issue at trial. Simpson analogizes the exclusion of Dr. Stein's expert testimony to the prejudicial evidence that was admitted in *Jandres*. Dr. Stein's testimony, however, was only marginally probative on the issues of credibility. The prejudicial evidence in *Jandres* consisted of the "supposed (but, in fact, nonexistent) evidence of defendant's DNA inside [a girl's] mouth," which was "extremely harmful" to defendant's credibility since he expressly denied he put his fingers in the girl's mouth. (*Id*. at p. 360.) In other words, the evidence in *Jandres* "tended strongly to impeach" the defendant. (*Ibid*.)

Dr. Stein's expert testimony would not have strongly impeached the victims' credibility, nor would it have raised serious concerns about their respective testimonies. Likewise, her testimony would not have strongly bolstered Simpson's credibility. Accordingly, we find that it is not reasonably probable that Simpson would have received a more favorable result had Dr. Stein testified.

64

## D. Admission of Evidence Under Evidence Code Section 1108

Simpson argues that the trial court erred when it admitted A.C.'s testimony about the nude cartoon image under Evidence Code section 1108 and did not properly instruct the jury on how to use the evidence. Simpson further argues that the trial court failed to limit the use of the evidence of Simpson's affair with sister-in-law.

### 1. A.C.'s Testimony

#### a. Background of A.C.'s Testimony

Before A.C. testified, the trial court held a hearing under Evidence Code section 402. At the hearing, A.C. testified about two incidents involving Simpson, one being an incident where Simpson stumbled across a "weird sex [chat] room" while using a computer and another being the incident where Simpson showed him a nude cartoon image of Lara Croft. The prosecutor argued that A.C.'s testimony was admissible under Evidence Code sections 1101, subdivision (b) and 1108. The prosecutor claimed that the conduct fell under section 647.6, annoying or molesting a child, which was specifically enumerated in Evidence Code section 1108, and was not more prejudicial than probative. The trial court permitted A.C. to testify about the nude cartoon image but excluded his testimony about the chat room.

After the close of evidence, the trial court instructed the jury on the proper use of A.C.'s testimony as follows: "The People presented evidence of behavior of the defendant that was not charged in this case. This behavior was showing a nude image to [A.C.] when [A.C.] was 13-14 years old and the defendant was 18-19 years old. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact engaged in this uncharged behavior. . . . [¶] If the people have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant engaged in this uncharged behavior, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to

65

commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit lewd or luscious [*sic*] acts on a child under fourteen, as charged here. If you conclude that the defendant engaged in this uncharged behavior, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty . . . . The People must still prove each charge and allegation beyond a reasonable doubt."

### b. *General Legal Principles*

Typically, evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) The Legislature, however, has created an exception to this rule in cases involving sexual offenses, so long as the evidence is admissible under Evidence Code section 352. (*People v. Cottone* (2013) 57 Cal.4th 269, 281; Evid. Code, § 1108, subd. (a).) Evidence Code section 1108, subdivision (d) defines a sexual offense as "a crime under the law of a state or of the United States" that involves certain types of conduct and the violations of certain statutes, including section 647.6.

"[T]he admissibility of uncharged conduct pursuant to section 1108 turns on the existence of a preliminary fact—namely, that the uncharged conduct constitutes a statutorily-enumerated 'sexual offense.' " (*Jandres*, *supra*, 226 Cal.App.4th at p. 353.) "The trial court must make a preliminary determination of whether the proffered evidence is sufficient for the jury to find, by a preponderance of the evidence, that the defendant committed an enumerated offense." (*Ibid*.) We review the trial court's determination of this preliminary fact for an abuse of discretion. (*Ibid*.)

### c. *Admission of A.C.'s Testimony*

The prosecution argued that Simpson's conduct constituted a sexual offense because it violated section 647.6, which prohibits annoying or molesting a child under the age of 18. A violation of section 647.6 requires proof of the following elements: "(1) the

66

existence of objectively and unhesitatingly irritating or annoying conduct; (2) motivated by an abnormal sexual interest in children in general or a specific child; (3) the conduct is directed at a child or children, though no specific child or children need to be the target of the offense; and (4) a child or children are victims." (*People v. Phillips* (2010) 188 Cal.App.4th 1383, 1396, fn. omitted.)

Assuming the trial court made a preliminarily factual determination that the conduct was a violation of section 647.6, it did not abuse its discretion. Although this is a close issue, a jury could conceivably infer that Simpson's actions were motivated by an abnormal sexual interest in children because they were directed at A.C., who was a minor. It is also conceivable to infer that the conduct was objectively and unhesitatingly irritating or annoying.

However, we agree with Simpson that the trial court abused its discretion in admitting the evidence under Evidence Code section 352. In *Jandres*, this court observed that "[a]s to probative value, ' "[t]he court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered . . . ." ' " (*Jandres*, *supra*, 226 Cal.App.4th at p. 355.) The uncharged offense must have some tendency to prove that the defendant is predisposed to commit the charged crimes. (*Id*. at pp. 355-356.)

Simpson was charged with five counts of committing lewd and lascivious acts on minor girls by touching them inappropriately. The uncharged conduct involved Simpson showing a teenage boy a nude image of a cartoon videogame character. The charged crimes and the uncharged conduct bore little similarity, and evidence of the uncharged conduct does not rationally support an inference that Simpson had a predisposition or a propensity to commit the charged sexual offenses. In sum, the uncharged conduct had minimal probative value. (See *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 [propensity evidence has probative value if uncharged conduct is similar enough to

charged behavior to tend to show defendant did in fact commit the charged offense].)
Although the potential for prejudice was also low—A.C.'s testimony was brief and the
uncharged conduct was not particularly inflammatory—the minimal probative nature was
still substantially outweighed by the potential for prejudice. (Evid. Code, § 352.)

Nonetheless, admission of the evidence was harmless. (See *Jandres*, *supra*, 226
Cal.App.4th at p. 357 [error in admission or exclusion of evidence under § 1108 is
reviewed under *Watson* harmless error test].) A.C.'s testimony was short, and the
conduct that he described was not particularly egregious compared to the charged crimes.
We do not believe that had his testimony been excluded, it is reasonably probable that
Simpson would have received a more favorable verdict.

### d. *Jury Instructions*

Next, Simpson claims the trial court erred when it instructed the jury about how to
use evidence of the uncharged act. Simpson's trial counsel did not object to the
challenged instructions below, but we reach the merits of his claim. " 'Generally, a party
may not complain on appeal that an instruction correct in law and responsive to the
evidence was too general or incomplete unless the party has requested appropriate
clarifying or amplifying language.' [Citation.] But that rule does not apply when, as
here, the trial court gives an instruction that is an incorrect statement of the law." (*People
v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) We review errors in jury instructions de
novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

We agree with Simpson that the jury instruction, as given, misstated the law.
(*Jandres*, *supra*, 226 Cal.App.4th at pp. 358-359 [the court must instruct the jury on
elements of the offense or offenses].) The instruction described the uncharged offense as
"showing a nude image to [A.C.]." The uncharged offense, however, was a violation of
section 647.6, and the jury instruction made no mention of that provision. The
instruction also failed to inform the jury of the elements of section 647.6 and did not tell

68

the jury that it needed to find that the prosecution proved the elements of the crime by a preponderance of the evidence.

However, the instructional error was harmless because it is not reasonably probable that absent the error, Simpson would have received a more favorable result. (*Jandres*, *supra*, 226 Cal.App.4th at p. 359 [applying *Watson* harmless error test to instructional error in jury instruction on use of sexual assault propensity evidence].) As we have determined above, the uncharged act at issue had relatively low probative value. Correspondingly, it had relatively low prejudicial value. We do not believe that a properly instructed jury would have been likely to return a verdict more favorable to Simpson. (*Ibid*.; *Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

### 2. *Evidence of Simpson's Affair with Sister-in-law*

#### a. *Background*

During cross-examination, the prosecutor asked Simpson if he was "grooming" sister-in-law when he had the affair with her. Simpson's trial counsel objected to the question, and the trial court sustained the objection. Later, the prosecutor asked Simpson if having an affair with sister-in-law was "a more serious level of wrong." Simpson answered yes.

#### b. *Analysis*

Simpson argues that the prosecutor improperly argued during closing argument that Simpson's affair with sister-in-law, who was an adult at the time, was further proof that he molested victim1 and victim2. Simpson insists that the evidence of his affair with sister-in-law was not admitted as uncharged sexual propensity evidence under Evidence Code section 1108, and the prosecutor improperly used it as bad character evidence.

First, Simpson has forfeited his argument pertaining to the prosecutor's question about whether having an affair with sister-in-law was "a more serious level of wrong." When the prosecutor asked this question, Simpson's trial counsel made no objection

below. A specific and timely objection to evidence is required to preserve the argument on appeal. (Evid. Code, § 353, subd. (a); *Demetrulias*, *supra*, 39 Cal.4th at p. 22 [objection to evidence must be preserved by specific objection at time evidence was introduced].) Likewise, Simpson has forfeited his claim that the prosecutor improperly argued that his affair with sister-in-law, which the prosecutor described as indicating a "pattern of avoiding responsibility," tended to show that he committed the charged crimes. When the prosecutor made the argument, Simpson's trial counsel did not object to the argument as improper or as misconduct. (See *Dykes*, *supra*, 46 Cal.4th at p. 763 [failure to object to prosecutorial misconduct forfeits claim on appeal].)

Second, Simpson's trial counsel objected when the prosecutor asked Simpson if he was "grooming" sister-in-law, and the trial court sustained the objection and Simpson was not permitted to answer it, eliminating any possible prejudice. (See *Fuiava*, *supra*, 53 Cal.4th at p. 687 ["[t]he trial court sustained defendant's objection to the question . . . eliminating any possibility of prejudice"].) The jury was also instructed that "[n]othing that the attorneys say is evidence," and "[the attorneys] questions are not evidence."

Simpson argues that his counsel's failure to object below to any of the challenged evidence or argument amounted to ineffective assistance. We disagree. Simpson's counsel may have rationally decided not to object to the evidence of the affair because Simpson's defense in part relied on the affair as evidence that sister-in-law may have had ulterior motives when she disclosed the molestation to the police. (See *Mai*, *supra*, 57 Cal.4th at p. 1009 [reversal is required for ineffective assistance of counsel only if record affirmatively demonstrates counsel had no rational tactical purpose, counsel was asked for a reason and failed to provide one, or there simply could be no satisfactory explanation for counsel's omissions].) Moreover, the allegedly improper evidence cited by Simpson—which included his acknowledgment that having an affair with sister-in-law was a "more serious level of wrong" and the prosecutor's claim that having an affair

70

demonstrated that he had a pattern of irresponsible behavior—was brief and not particularly prejudicial. Simpson does not demonstrate that his counsel's failure to object caused him prejudice. (*Strickland*, *supra*, 466 U.S. at p. 694.)

### E. Exclusion of the Pretext Phone Call

Simpson claims that the trial court erred when it excluded evidence of a pretext call where he denied the allegations that he molested victim1 and victim2. He argues that exclusion of the pretext call deprived him of his rights to present a defense and to effective assistance of counsel.

#### 1. *Background*

In a pretrial motion in limine, the prosecutor sought to exclude statements made by Simpson during a pretext phone call with victim1 and victim2's mother that took place on July 8, 2015. In the pretext phone call, Simpson denied that he ever molested victim1 or victim2. According to the transcript of the call, mother told Simpson, "The girls have said that you stuck their finger in their butts." Simpson responded, "Well that never happened. That's disgusting." The trial court granted the prosecutor's motion to exclude evidence of the pretext phone call.

Later, during closing argument, the prosecutor argued that wife and Simpson "synced" their testimonies after preparing for trial.

#### 2. *General Legal Principles*

Evidence Code section 791 provides that a witness's prior statement is inadmissible to support his or her credibility unless it is offered after "(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or influenced by bias or other improper motive, and the statement was made before the bias, motive for

71

fabrication, or other improper motive is alleged to have arisen." Evidence Code section 1236 provides that "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 791." We review the trial court's evidentiary decision for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

### 3. *Forfeiture*

Preliminarily, the record does not reflect that Simpson's trial counsel sought admission of the pretext phone call on the grounds that he now raises on appeal. The record does not show that his counsel argued that the pretext phone call was admissible as a prior consistent statement or that any of the statements contained within the phone call were admissible as spontaneous statements or admissible for nonhearsay purposes. Accordingly, we find that the issues raised are not cognizable on appeal because Simpson did not present these theories of admissibility below. (*People v. Ervine* (2010) 47 Cal.4th 745, 779; Evid. Code, § 354.)

### 4. *Ineffective Assistance of Counsel*

Alternatively, Simpson argues that his trial counsel was ineffective for failing to seek admission of the pretext phone call on the grounds raised on appeal. First, Simpson argues that the pretext phone call was a prior consistent statement that rebutted an implied charge of recent fabrication or recent bias. Simpson claims that when the prosecutor cross-examined him and wife, he implied that they had fabricated their testimony after reviewing the statements, interviews, and prior testimonies of victim1 and victim2. Moreover, Simpson argues that the prosecutor made the charge of recent fabrication *explicit* during closing argument when he argued that Simpson and wife's testimony felt "scripted and rehearsed" and that Simpson and wife had "read everything, prepared everything, and they synced up their answers" for the trial.

72

Simpson, however, fails to demonstrate that the pretext phone call was admissible. The statements that Simpson made in the phone call were inadmissible hearsay, and the exceptions described in Evidence Code section 791 were inapplicable. Simpson claims that the pretext phone call should have been admitted because it rebutted the prosecution's implied and express charge that his denial was fabricated. However, in 2015 when the pretext phone call was made, Simpson possessed the same motive to fabricate his denial—to escape culpability for his actions after he learned that victim1 and victim2 were accusing him of sexual abuse. (Evid. Code, §§ 791, 1236.) The statements made in the pretext phone call were not "made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).)

Simpson relies on *People v. Carter* (1957) 48 Cal.2d 737, which we find distinguishable. In *Carter*, the California Supreme Court determined that it was error for the trial court to exclude evidence that the defendant had told the same story to a reverend before he told the story at trial: that the defendant had left a bar, returned to find the victim lying on the floor, and got blood on his clothes after he turned the victim over. (*Id*. at p. 749.) At the time the defendant made the statement to the reverend, the defendant did not know that the blood on his clothes had been analyzed to match the victim's blood type or that hairs similar to the victim's had been found on his pants. (*Ibid*.) Thus, *Carter* concluded that the defendant had the right to introduce this prior consistent statement to rebut the prosecution's claim that the defendant's story was recently fabricated. (*Ibid*.) *Carter* is distinguishable from the case at bench. There, the prior consistent statement was made *before* the *Carter* defendant became aware of the motive for fabrication—the existence of forensic evidence tying the victim's blood and hair to the defendant. In contrast, here the *same* motive for fabrication existed during both the pretext call and Simpson's later testimony at trial. Since the phone call was inadmissible, Simpson's claim of ineffective assistance of counsel fails.

Simpson further argues that his denials of molestation were admissible either under the spontaneous statement hearsay exception (Evid. Code, § 1240) or admissible as nonhearsay because it was not offered for the truth of the matter asserted. In response to mother's statement that the victims had accused him of "sticking their [*sic*] finger in their butts," Simpson responded, "Well that never happened. *That's disgusting*. Never happened." (Italics added.) Simpson argues that his reaction to the accusation was made under the stress of being accused without time for reflection.

Assuming Simpson's brief reaction—"[t]hat's disgusting"—was admissible, Simpson cannot demonstrate that its exclusion caused him prejudice. Simpson argues that the statement was "highly probative" because it "displayed [his] strong aversion to the type of molestation alleged by [victim1]." The statement, however, was fleeting, and the jury would have had multiple reasons to discredit its veracity. Simpson made the statement when confronted by the victims' mother, and he repeatedly denied the allegations that he inappropriately touched the two girls. The fact that he responded that the type of touching alleged by victim2 was "disgusting" is not particularly probative of his guilt.

Finally, Simpson argues that his trial counsel rendered ineffective assistance when he failed to object to the prosecutor's argument that he and wife "synced" their testimonies after preparing for his case.

Simpson relies on *People v. Daggett* (1990) 225 Cal.App.3d 751, which is distinguishable. In *Daggett*, the trial court excluded evidence that the victim of a molestation had previously been molested by two older children. (*Id.* at p. 757.) The victim had later molested other children. The prosecutor argued to the jury that if they believed that the victim had molested other children, the victim must have learned the behavior after being molested by the defendant—which was "the type of argument the excluded evidence was intended to refute." (*Ibid.*) The *Daggett* court concluded that the

74

prosecutor's argument constituted misconduct because he "asked the jurors to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded." (*Id*. at p. 758.)

In *Daggett*, the prosecutor made an argument that would have been clearly rebutted based on the excluded evidence. Simpson's repeated denials in the pretext phone call would *not* have clearly rebutted the prosecution's opinion of the veracity of wife's and Simpson's veracity. Furthermore, the argument was not misconduct because it was an inference based on evidence before the jury. "When arguing to the jury, it is misconduct for a prosecutor to express a personal belief in the defendant's guilt if there is a substantial danger that the jurors will construe the statement as meaning that the belief is based on information or evidence outside the trial court [citation], but expressions of belief in the defendant's guilt are not improper if the prosecutor makes clear that the belief is based on the evidence before the jury." (*People v. Mayfield* (1997) 14 Cal.4th 668, 781-782, abrogated on a different ground as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390.)

Wife acknowledged on cross-examination that she had read the police reports and the victims' prior statements. Likewise, Simpson acknowledged that he watched the victims testify. The prosecutor's comment on the truthfulness of wife and Simpson's trial testimonies was based on evidence before the jury and did not constitute misconduct. Therefore, Simpson's trial counsel was not ineffective for failing to make a meritless objection to it.

### F. *The Fresh Complaint Evidence*

Simpson claims that the trial testimonies of J.G., C.A., A.C.2, and sister-in-law about the victims' demeanor when they made their disclosures and the emotional damage that they suffered exceeded the scope of what is admissible under the fresh complaint doctrine.

75

1. *General Legal Principles*

" ' "Hearsay evidence," ' defined as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated' is generally inadmissible. (Evid. Code, § 1200.)" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*), disapproved of on a different point as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*).) In *Brown*, our Supreme Court explained that evidence of a fresh complaint may be relevant because "admission of evidence that such a prompt complaint was made also will eliminate the risk that the jury, if not apprised of that fact, erroneously will infer that no such prompt complaint was made. (*Id*. at p. 761.)

*Brown*, however, observed that fresh complaint evidence should be "carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose" (*Brown*, *supra*, 8 Cal.4th at p. 762)—such as proving that the underlying sexual offense occurred (*id*. at p. 763). A victim's identifications of the assailant(s) and the nature of the crime(s) are properly included within evidence of the fresh complaint. (*People v. Burton* (1961) 55 Cal.2d 328, 351, abrogated on a different point in *Brown*, *supra*, at pp. 756-757, 763.)

The admissibility of fresh complaint evidence does not turn "upon whether the victim's complaint was made immediately following the alleged assault or was preceded

76

by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry or questioning from another person." (*Brown*, *supra*, 8 Cal.4th at p. 763.) Instead, the jury may consider those factors in assessing the significance of the victim's complaint. (*Ibid.*)

"Evidence of a statement of a declarant's state of mind, when offered to prove or explain the declarant's conduct, is admissible, as long as the statement was made under circumstances indicating its trustworthiness. (Evid. Code, §§ 1250, subd. (a)(2), 1252.) A prerequisite to this exception is that the victim's mental state or conduct be placed in issue." (*Guerra*, *supra*, 37 Cal.4th at p. 1114.) For example, "[e]vidence of [a] murder victim's fear of the defendant is admissible when the victim's state of mind is relevant to an element of an offense." (*Ibid.*)

" 'When the court abuses its discretion in admitting hearsay statements, we will affirm the judgment unless it is reasonably probable a different result would have occurred had the statements been excluded.' " (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1526.)

"Because of the limited purpose for which the out-of-court statements of victims may be admitted as fresh complaints, past cases have held that the trial court upon request must instruct the jury to consider such evidence only for the purpose of establishing that a complaint was made, so as to dispel any erroneous inference that the victim was silent, but not as proof of the truth of the victim's statement." (*Brown*, *supra*, 8 Cal.4th at p. 757.) "However, the trial court has no duty to give such an instruction in the absence of a request." (*People v. Manning* (2008) 165 Cal.App.4th 870, 880.)

2. *Forfeiture*

In his opening brief, Simpson argues that his trial counsel objected to the fresh complaint evidence "during discussion of in limine motions in chambers." Trial counsel, however, did not make specific objections when J.G., C.A., A.C.2, and sister-in-law

77

testified about the circumstances of victim1's and victim2's fresh complaints.

Trial counsel also did not object when several of the witnesses, including J.G., testified about how the victims felt emotionally damaged after the instances of sexual abuse. Questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground now sought on appeal. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 717; Evid. Code, § 353.) Thus, Simpson has forfeited appellate review of his claims that the testimony was improperly admitted.

Simpson's trial counsel also did not object to any of the prosecutor's questions as misconduct, and failure to object to prosecutorial misconduct in a timely fashion forfeits the claim on appeal. (*People v. Hill*, *supra*, 17 Cal.4th at p. 820.)

3. *Ineffective Assistance of Counsel*

Alternatively, Simpson argues that his trial counsel rendered ineffective assistance by failing to object on the grounds now raised on appeal.

Simpson's trial counsel, however, was not ineffective for failing to object to the witnesses' testimonies about victim1's and victim2's demeanors when they made their fresh complaints. C.A. testified that she and victim2 were both crying when victim2 disclosed what had happened to her. A.C.2 testified that victim1 started to cry and hyperventilate when she stated that she had been sexually abused. Sister-in-law testified that victim1 and vitim2 were crying when they disclosed what had happened to them. The witnesses' description of the victims' demeanors when they made their disclosures did not recount any statements and was not hearsay. Fresh complaint evidence properly includes "the circumstances surrounding the making of the complaint." (*Brown*, *supra*, 8 Cal.4th at p. 762.) Trial counsel was not ineffective for failing to make a meritless objection to admissible evidence.

78

Simpson also argues that his counsel rendered ineffective assistance when he failed to object to the witnesses' testimonies about how the sexual abuse caused emotional trauma. J.G. testified that victim2 said that she was "damaged" and that it would take her a "while to recover from it." C.A. testified that victim2 said that she felt "dirty." The Attorney General argues that to the extent the victims made statements describing their state of mind, the statements fell within the hearsay exception under Evidence Code section 1250.

Assuming that the evidence was inadmissible, we find that Simpson cannot demonstrate that he was prejudiced by his counsel's failure to object below. The record sheds no light on trial counsel's failure to object, and trial counsel's omission could have been a tactical decision not to draw the jurors' attention to the passing comments.[15] (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [no ineffective assistance of counsel when counsel's failure to object could be explained as tactical decision not to draw the jurors' attention to comments by the prosecutor].) Additionally, the statements made by J.G. and C.A. about victim2's emotional trauma were brief and they were cumulative of victim2's testimony at trial, where she characterized her memories of the abuse as traumatic.[16] It is not reasonably probable that absent counsel's omissions, he would have received a more favorable verdict. (*Strickland*, *supra*, 466 U.S. at p. 694.)

---

[15] In the declaration that trial counsel prepared in support of Simpson's motion for a new trial, trial counsel stated: "I recall objecting to fresh complaint evidence on statutory and constitutional grounds. I did not intend to waive or forfeit an objection to this evidence." Trial counsel did not indicate that he intended to object to the testimony of the witnesses that *exceeded* the scope of the fresh complaint doctrine.

[16] In his reply brief, Simpson argues that the victims' description of their own emotional trauma was inadmissible and an improper appeal to sympathy. We disagree. Although only relevant evidence is admissible, evidence of the victims' trauma was relevant to their credibility because it explained the delay and reluctance in reporting the abuse. (See Evid. Code, § 210.)

Simpson also cannot demonstrate that his trial counsel was ineffective for failing to request a limiting instruction regarding the fresh complaint evidence. Trial counsel may have tactically decided not to request a limiting instruction because it would highlight the evidence. (See *People v. Hinton* (2006) 37 Cal.4th 839, 878 [trial counsel may have "deemed it unwise" to call further attention to prior murder conviction and when it did not request limiting].)

Next, Simpson challenges the admission of sister-in-law's testimony that she believed the victims' allegations. Typically, "a lay witness's opinion about the veracity of another person's particular statements is *inadmissible* and *irrelevant* on the issue of the statements' credibility." (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 239 (*Zambrano*).) However, "a court may permit [questions about another witness's veracity] if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*People v. Chatman* (2006) 38 Cal.4th 344, 384 (*Chatman*).) The victims' credibility was at issue. Sister-in-law had a relationship with the victims and Simpson, and she may have had personal knowledge about why the victims might be lying. (*Id.* at p. 383 [concluding that because defendant knew witnesses well, he might have known why they might lie].) Trial counsel may have reasonably believed that an objection to the testimony would not have been sustained, and counsel does not render ineffective assistance by making a meritless objection. Simpson's claim of ineffective assistance of counsel fails.

## G. Additional Claims of Prosecutorial Misconduct

Simpson identifies several other instances where the prosecutor allegedly committed misconduct in questioning and in argument and argues that the misconduct constituted reversible error.

### 1. *Argumentative Questions During Simpson's Cross-examination*

First, Simpson argues that the prosecutor erred when he repeatedly asked improper questions during Simpson's cross-examination, including questioning whether Simpson "groom[ed]" sister-in-law, or whether Simpson used his "brotherly" relationship with sister-in-law to gain a sexual advantage.

Simpson's trial counsel objected to these questions, and the trial court sustained the objections. Although the trial court found the questions to be improper, they did not amount to prejudicial misconduct, especially where the trial court sustained his counsel's objections. (*People v. Peoples* (2016) 62 Cal.4th 718, 794.) "The 'critical inquiry on appeal is not how many times the prosecutor erred but whether the prosecutor's errors rendered the trial fundamentally unfair or constituted reprehensible methods . . . to attempt to persuade the jury.' " (*Ibid.*) Given that the trial court sustained the objections to the prosecutor's argumentative questions, the prosecutor's misconduct does not meet this standard.

### 2. *"Were They Lying" Questions*

Next, Simpson claims that defense counsel failed to object to the prosecutor's series of improper "were they lying" questions. During cross-examination, the prosecutor asked Simpson whether victim1, victim2, A.C., and sister-in-law lied when they testified at trial. Since Simpson's trial counsel did not object to any of these questions, he has forfeited his claims. (*People v. Hill*, *supra*, 17 Cal.4th at p. 820.)

Simpson's alternate claim that his trial counsel rendered ineffective assistance by failing to raise objections is also meritless. As we previously stated, "a lay witness's opinion about the veracity of another person's particular statements is *inadmissible* and *irrelevant* on the issue of the statements' credibility." (*Zambrano*, *supra*, 124 Cal.App.4th at p. 239.) However, "[a] defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are

testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or merely mistaken. When, as here, the defendant knows the other witnesses well, he might know of reasons those witnesses might lie. Any of this testimony could be relevant to the credibility of both the defendant and the other witnesses." (*Chatman*, *supra*, 38 Cal.4th at p. 382.)

Simpson had personal knowledge of his interactions with victim1, victim2, A.C., and sister-in-law. He also had personal relationships with each of the witnesses, and he had personal knowledge of the relevant facts about which he was questioned. He therefore had insight into the witnesses' supposed "bias, interest, or motive to be untruthful." (*Chatman*, *supra*, 38 Cal.4th at p. 381.) As a result, the prosecutor's questions elicited testimony that could assist the trier of fact in resolving key credibility questions, and Simpson's trial counsel was not ineffective for failing to object.

### H. Additional Claims of Ineffective Assistance of Counsel

Simpson argues that the judgment must be reversed because his counsel rendered ineffective assistance in a multitude of ways. Simpson argues that his trial counsel appeared to suffer from a medical condition and was disoriented and disorganized in his presentation of the defense, failed to investigate and present good character evidence, failed to impeach A.C., victim1, victim2, and victim1 and victim2's mother, failed to adequately prepare Simpson and wife for trial, and failed to adequately investigate evidence related to older brother and sister-in-law. Simpson insists that even if his counsel's omissions are not individually prejudicial, they are cumulatively prejudicial. We apply the same standard of review for ineffective assistance that we discussed in the

82

previous section of our opinion (part *C.3*) and, as we explain, we find no merit to his contentions.[17]

### 1. *Trial Counsel's Disorganization and Apparent Illness*

#### i. *Background*

Simpson submitted multiple declarations in support of his new trial motion. Several jurors submitted declarations that attested that trial counsel appeared unprepared and seemed to be "not fully there." Dr. Stein also submitted a declaration where she described that after trial counsel's "unspecified illness," there was a "marked deterioration" in his work, and he failed to follow up on numerous issues. A friend of Simpson who was also a certified emergency medical technician attended parts of the trial, including trial counsel's closing argument, and submitted a declaration that he believed that trial counsel was suffering from some type of dementia or other medical condition that impinged on his cognitive functions. Another one of Simpson's friends who attended the trial prepared a declaration that stated that trial counsel stammered, stuttered, and seemed to lose his train of thought during argument.

#### ii. *Analysis*

Simpson argues that there is evidence that his trial counsel was "ill or having difficulty focusing" during trial. He argues that his trial counsel seemed disorganized, at

---

[17] Simpson raised his claims of ineffective assistance of counsel in his motion for a new trial after he retained a new attorney. In support of the motion, Simpson's attorney attached declarations from Simpson, his wife, his trial counsel, Dr. Stein, numerous character witnesses, several jurors, and a defense investigator. He also attached additional documentary evidence such as transcripts of the victims' prior interviews. As we stated in part *C.3* of this opinion, when the trial court has denied a motion for new trial based on a claim of ineffective assistance of counsel, we uphold the trial court's factual findings to the extent they are supported by substantial evidence. (*People v. Taylor*, *supra*, 162 Cal.App.3d at pp. 724-725.) In this case, the trial court made few factual findings because it denied the motion without holding an evidentiary hearing.

one point he was unable to find a marker that was in front of him, and at another point he told the trial court that he needed to wait for Simpson to return from his break even though Simpson was sitting on the witness stand.

We find that Simpson fails to demonstrate ineffective assistance of counsel on this ground. In order to succeed on a claim of ineffective assistance of counsel, Simpson must demonstrate that "his counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, *supra*, 466 U.S. at p. 687.) However, Simpson does not identify specific instances where trial counsel's mental faculties specifically impeded his defense, other than a courtroom witness's observations of trial counsel's demeanor during closing arguments and Dr. Stein's claim that trial counsel failed to follow up with her on numerous issues.[18] As a result, Simpson does not meet his burden to demonstrate that trial counsel's apparent illness deprived him of effective representation.

We also reiterate that Simpson brought this claim of ineffective assistance of counsel in his motion for new trial. The trial court denied the motion without holding an evidentiary hearing.[19] In so doing, we infer that the trial court found that this claim had no merit and could be decided on the declarations and evidence submitted in connection with the motion. The trial court, over the course of the trial, had the opportunity to observe and evaluate Simpson's trial counsel's performance. "The trial judge is the one best situated to determine the competency of defendant's trial counsel." (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483.) Presumably, if the trial court believed that

---

[18] We addressed whether trial counsel's failure to procure Dr. Stein's testimony amounted to ineffective assistance of counsel in a prior section of our opinion (part *C.3*).

[19] Simpson does not challenge the trial court's decision not to hold an evidentiary hearing on the claims of ineffective assistance of counsel raised in his motion for a new trial.

Simpson's trial counsel was affected by an illness that impaired his cognitive functions, the trial court would have examined the issue further.

Moreover, we have carefully reviewed the transcript of the proceedings. Simpson's trial counsel made sensible objections during the trial and made reasonable efforts to cross-examine the victims and the prosecution's witnesses. Ineffective assistance of counsel is not clearly demonstrated by the record before us.

2. ***Failure to Present Good Character Evidence***

i. ***Background***

The only character witness presented by the defense was N.R., who testified that she had known Simpson since 2008 and had always seen him act appropriately with female members in the study groups that he assisted with.

In support of Simpson's motion for a new trial, N.R. prepared a declaration. In her declaration, N.R. said that Simpson had a good reputation for honesty and for "not being sexually attracted to children." Victim2, however, had a bad reputation for honesty and was known as a "liar and exaggerator" among her peers. N.R. asserted that trial counsel never contacted or interviewed her prior to Simpson's trial, and she believed that she testified almost by "accident." N.R. came to Simpson's trial to support Simpson and wife, and at the last minute, she was asked to testify as a character witness. N.R. claimed that defense counsel did not even seem to know her name or who she was until moments before she testified, and trial counsel did not question her beforehand or prepare her for her testimony.

Several other potential character witnesses prepared declarations in support of Simpson's motion for new trial, including E.R., R.R., and R.F. The potential witnesses, who knew Simpson through his church activities, asserted that they believed Simpson had a good reputation and was not sexually attracted to children. E.R. was prepared to

testify that he believed victim2 was dishonest. Each of the witnesses asserted in their declarations attested that trial counsel did not contact them.

Trial counsel explained in his declaration that he "scramble[d]" to prepare a defense because the prosecution rested early, and he did not meet with or contact any other character witnesses aside from N.R. Trial counsel also claimed that he believed that it would have been "helpful" if he had the opportunity to present evidence of Simpson's character for honesty.

ii.    *Analysis*

Simpson argues that his counsel failed to investigate and present good character evidence of his honesty and non-deviance. He also claims that his counsel failed to request a good character instruction.

Simpson claims that his trial counsel's declaration conceded that he had no tactical reason for failing to bring character witnesses. We disagree. In his declaration, trial counsel claimed that it would have been "helpful" if he had the opportunity to present evidence of Simpson's character for honesty and that he had "scramble[d]" to present a defense after the prosecution rested early, but trial counsel did not specifically assert that his failure to contact other character witnesses was not a strategic choice. It is also unclear as to whether trial counsel's comment about the possible benefit of character witnesses to Simpson's defense was a remark made with the benefit of hindsight, and a failure to present character witnesses was not objectively unreasonable under the circumstances present in this case. E.R., R.R., and R.F. all knew Simpson through his activities with his church and his church's youth groups. Trial counsel may have wanted to strategically limit evidence of Simpson's work with children due to the nature of the victims' allegations. Thus, Simpson has not " 'overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 158, superseded by statute as stated on other

86

grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8; see *Mendoza*, *supra*, at p. 158 ["a court must eliminate the distorting effects of hindsight by indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' "].)

Moreover, Simpson does not demonstrate that he was prejudiced by his counsel's failure to present additional witnesses. The crimes alleged against Simpson were committed in private when Simpson was alone with the victims. The testimony of adult character witnesses and their opinions of Simpson's good character and reputation for honesty, derived from their observations of Simpson's behavior in public, may not have been of significant probative value. Additionally, introducing character witnesses that questioned victim2's credibility may have even harmed the defense because a jury might not have favorably received an attack on the veracity of a sympathetic witness. As a result, we find that it is not reasonably probable that had the additional witnesses testified, Simpson would have received a more favorable result. (*Strickland*, *supra*, 466 U.S. at p. 694.)

Simpson also argues that his trial counsel rendered ineffective assistance by failing to elicit testimony from N.R. that she believed that Simpson had a reputation for honesty and for "not being sexually attracted to children."

The record, however, is silent as to why trial counsel failed to elicit an opinion of Simpson's character from N.R. And this is not a situation where there can be no rational, tactical reason for trial counsel's actions. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) Under Evidence Code section 1101, subdivision (a), evidence of a person's character is inadmissible, whether in the form of an opinion, reputation, or specific instances of conduct, to prove that person's conduct on a specific occasion. However, "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" is admissible when "(a) Offered by the defendant to prove his conduct

87

in conformity with such character or trait of character[; or] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (Evid. Code, § 1102, subds. (a) & (b).) Therefore, eliciting testimony about Simpson's character from N.R. could have opened the door for the prosecution to rebut Simpson's character evidence with evidence of his bad character under Evidence Code section 1102, subdivision (b). Trial counsel's decision not to introduce character evidence may have reasonably been the product of trial tactics.

Finally, we reject Simpson's claim that trial counsel was ineffective for failing to request a good character instruction pursuant to CALCRIM No. 350. CALCRIM No. 350 provides in pertinent part that "[e]vidence of the defendant's character for [non-deviant sexual behavior] can by itself create a reasonable doubt [as to] whether the defendant committed" the charged crimes. Here, the record sheds no light on why trial counsel failed to request such an instruction. Regardless, we do not believe Simpson can demonstrate prejudice. Nothing prevented the jury from considering N.R.'s testimony for whatever purpose it felt appropriate given the circumstances. Additionally, N.R.'s testimony about Simpson's good conduct around study group members was relatively brief, and, again, her opinion of how Simpson conducted himself around other members—when other adults were present—was of limited probative value. We therefore do not believe that trial counsel's failure to request the instruction amounted to ineffective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at p. 694.)

3. ***Failure to Impeach A.C.***

i. ***Background***

In support of his new trial motion, Simpson submitted a declaration prepared by A.C.'s father. According to the declaration, A.C. was a veteran and was discharged from the army following a positive drug test. Following his military service, A.C. was diagnosed with posttraumatic stress disorder (PTSD) and other health issues, was

88

classified as "100% disabled," and received disability payments. A.C. had also participated in several drug abuse programs, and he was presently taking medical marijuana and prescribed psychiatric medication to manage his medical conditions.

### ii.     *Analysis*

Simpson argues that his trial counsel failed to investigate A.C.'s background and did not use any evidence to impeach A.C.'s credibility when he testified. The record, however, is silent as to trial counsel's decision not to impeach A.C., and this is not a situation where there can be no satisfactory explanation for counsel's omission. (*Mai*, *supra*, 57 Cal.4th at p. 1009.) An attorney's decision with respect to how to question a witness is afforded substantial deference, and " '[t]he failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1140 (*Barnett*).) Trial counsel may have made the tactical decision not to impeach A.C. because he believed that the testimony provided by A.C. about the nude photograph was of limited probative value to Simpson's guilt, and drawing attention to A.C. as a witness may imply that A.C.'s testimony should be given greater weight. Accordingly, Simpson's claim of ineffective assistance of counsel on this ground must be rejected.

### 4.     *Failure to Impeach Victim1, Victim2, and Mother*

### i.     *Background*

Simpson attached transcripts of prior interviews and the preliminary hearing transcript to his motion for a new trial. Some of the statements made by victim1, victim2, and mother were inconsistent with their trial testimonies.[20]

---

[20] Simpson lists a total of 12 prior inconsistent statements in his opening brief:
(1) Victim2 told the police about the beach incident during her second interview, and victim2 explained that she recalled that the incident occurred after she spoke with the police during her first interview;
(continued)

ii.   *Analysis*

Simpson argues that his trial counsel rendered ineffective assistance when he failed to impeach victim1, victim2, and mother's credibility with their prior inconsistent statements.

First, we note that some of the witness's prior statements that were identified by Simpson are not wholly inconsistent with their respective trial testimonies, and some of the statements were taken out of context.[21]

---

(2) Victim2 conducted Internet research on inappropriate touching after the incident with J.G.;

(3) At the preliminary hearing and during her initial police interview, victim2 testified that wife was cooking dinner in the kitchen right next door to the bathroom during the shower incident;

(4) Victim1 initially told the Child Protective Services worker that Simpson touched her;

(5) Victim1 said that Simpson inserted his finger into her "anus" only after the police used the word "anus" in a series of leading questions during her first taped interview;

(6) Victim1 said in her third interview that the "Spiderman" incident took place when she watched the whole "Spiderman" series, which is inconsistent with the fact that "Spiderman 3" was released in May 2007;

(7) Victim1 did not mention the "Toy Story 3" incident during her first interview;

(8) Victim2 said that the "Toy Story 3" incident took place when she was 11 years old, but the funeral trip that wife took to Colorado took place in April 2007 when victim2 was eight years old;

(9) During the preliminary hearing, victim1 said that the "Toy Story 3" incident took place in Morgan Hill, but Simpson and wife were not living in Morgan Hill when "Toy Story 3" was released;

(10) Mother told officers that she initially did not believe victim2;

(11) Mother said that victim2 disclosed that Simpson touched her inappropriately in a conversation she had with victim2 about how she had told camp counselors that her father had beaten her; and

(12) The prosecutor characterized victim1 and victim2 as uncooperative witnesses but they each voluntarily met with prosecutors.

[21] For example, Simpson argues that mother stated in a prior police interview that she did not initially believe victim2 when victim2 disclosed the abuse to her. In the same (continued)

More importantly, there is nothing in the record to explain trial counsel's decision not to use these prior inconsistent statements, and many of the prior inconsistent statements were not so significant or substantial as to render trial counsel's failure to cross-examine victim1, victim2, or mother about them unreasonable. Victim1 and victim2 both testified that they had blocked memories of what had happened to them, and they each testified about events that took place many years before Simpson's trial. It would not have been significantly probative to cross-examine the victims about minor inconsistencies in some of their prior statements.

Trial counsel may have reasonably decided that cross-examining victim1 and victim2 about their respective recollections of the timeline of events was sufficient to cast reasonable doubt on the allegations. An attorney's decision with respect to how to question a witness is afforded substantial deference, and whether to impeach a trial witness is usually a matter of trial tactics that will not support a claim of ineffective assistance of counsel. (*Barnett*, *supra*, 17 Cal.4th at p. 1140.) This is not a situation

---

police interview, however, mother said that she began to believe victim2 after victim1 disclosed her molestation. These statements were not inconsistent with mother's trial testimony that she believed something happened with Simpson, but she did not know exactly what happened.

Another inconsistent statement identified by Simpson in his opening brief was a statement made by victim2 during an earlier police interview where she told officers that she "had a flashback" when her boyfriend touched her. Victim2 then went on to explain that *after* she had this flashback, she did some research on the computer to see if it was "normal[] for older people to just go up and touch whoever they feel like." We fail to see how this is inconsistent from victim2's trial testimony, where she explained that she had a flashback to the molestation when she kissed J.G.

Simpson also argues that victim1 only said that he put his finger inside her "anus" after the police used the word during a series of leading questions in an interview. Victim1's statement, however, was made after she answered an open-ended question by explaining that Simpson slid his hand down her back and went under her pants. The probative value of this statement is minimal.

where the record affirmatively discloses that counsel had no rational tactical purpose or that there was no satisfactory explanation for his decisions not to impeach the witnesses. (*Mai*, *supra*, 57 Cal.4th at p. 1009.) As a result, Simpson's claim of ineffective assistance of counsel on this ground fails.

5. *Failure to Prepare Simpson and Wife for Trial*

i. *Background*

In a declaration prepared in support of Simpson's motion for a new trial, wife stated that she and Simpson had always had a "normal sex life" and Simpson had never "put his finger in [her] anus or expressed any interest in doing so as part of [their] sex life." Wife also stated that she and Simpson were virgins until they married. Simpson echoed the same facts in his declaration—that he had never put his finger in wife's anus and such actions were not a part of their sex life, and he and wife were both virgins when they married. Both Simpson and wife claimed that trial counsel did not prepare them for trial before they testified.

Trial counsel's declaration stated that he did not have time to prepare Simpson or wife for their testimonies at trial, and he did not have time to prepare them for cross-examination. Trial counsel further declared that he did not spend time going over the questions that he anticipated asking them or going over potential questions that might be asked on cross-examination. Trial counsel, however, stated in his declaration: "It's my custom and practice not to have dry runs of testimony and not do questions and answers with defense witnesses."

ii. *Analysis*

On appeal, Simpson argues that trial counsel's failure to prepare Simpson and wife for trial and for cross-examination constituted ineffective assistance of counsel because it resulted in the exclusion of evidence that Simpson was not a sexual deviant—that he did

not put his fingers inside his wife's anus as a sex act and that he was a virgin when he married wife.

We disagree. Trial counsel was not asked why he did not present this type of evidence at trial, and his failure to do so could have served a tactical purpose. Evidence of Simpson's sex life and his virginity was not particularly probative as to Simpson's innocence or good character.[22] Because both Simpson and wife had a strong motive not to be truthful, it would not have been objectively unreasonable for trial counsel not to pursue these avenues of questions because they were not persuasive. We " 'will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185 (*Riel*); see also *People v. Price*, *supra*, 1 Cal.4th at p. 440 [defendant seeking relief on basis of ineffective assistance of counsel must show that counsel failed to act in a manner to be expected of reasonably competent attorneys acting as a diligent advocate].) Furthermore, given the evidence's relatively weak probative value, it is unlikely that even if such evidence was admitted, Simpson would have received a more favorable verdict. (*Strickland*, *supra*, 466 U.S. at p. 694.)

Simpson argues that trial counsel's failure to prepare him for trial resulted in testimony that defense counsel considered "so problematic" that he told the jury to ignore it in his closing argument. During closing argument, trial counsel stated, "I'd be the first one, and I'm [Simpson's] lawyer, to say that he didn't do a very good job of explaining himself." Trial counsel also admitted he did not believe Simpson was a "good witness."

Trial counsel, however, went on to argue that Simpson "hadn't been coached by me to get up there and here's what you got to say. [Simpson] got up there and told the truth to the best of his ability." Trial counsel also stated that Simpson "was doing the

---

[22] In their respective declarations, neither Simpson nor wife identify areas where they would have testified differently had they been adequately prepared for trial.

best he could" and that it was "nerve-racking to be sitting up there and be asked questions by a skilled, very intelligent, very adept prosecutor who's going to take you down to the very base and say this guy's not believable."

In this case, trial counsel was not asked about his strategy when he made his closing argument. Trial counsel, however, was present during Simpson's testimony, and he may have made the tactical choice to acknowledge the shortcomings in Simpson's testimony and argue that the prosecution had failed to satisfy its burden of proof. "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6.)

"In addition, because even the most carefully prepared witness may give a surprise answer, we may not hold defense counsel responsible for the potentially damaging responses furnished by a defendant or another witness." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1031-1032.) Trial counsel conceded that he did not prepare Simpson or wife for trial, but he also said that it was his custom not to do so. An attorney's decision not to run through potential questions to be asked on direct or cross-examination is not objectively unreasonable. (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1108 [defense counsel asserted that he did not prepare witnesses to avoid suspicion of "coaching"] (*Berryman*), disapproved of on a different point as stated in *People v. Hill* (1998) 17 Cal.4th 800, 822-823.)

Finally, Simpson does not provide any additional concrete examples of *how* further preparing him or wife would have resulted in a more favorable trial outcome. "He does not demonstrate that personal preparation [of himself or wife] would have yielded favorable results. Hence, he cannot demonstrate that its omission adversely affected the

94

outcome within a reasonable probability" to establish ineffective assistance of counsel. (*Berryman*, *supra*, 6 Cal.4th at p. 1108.)

### 6. *Failure to Present P.C.'s Testimony*

#### i. *Background*

P.C. submitted a declaration in support of Simpson's motion for a new trial. In her declaration, P.C. stated that she was friends with Simpson when she was growing up, and Simpson was approximately eight years older than she was. P.C. and her family sometimes went on fishing trips or camping overnight with Simpson. P.C. stated that Simpson never showed her any pornography or inappropriate photographs when she was a child, and Simpson never touched her inappropriately. P.C. called Simpson's trial counsel about being a witness, but she was never called back.

#### ii. *Analysis*

Simpson argues that he was permitted to rebut the prosecution's Evidence Code section 1108 evidence by producing evidence that he had not committed sexual assaults even though he had the opportunity to do so in the past. Simpson therefore argues that trial counsel rendered ineffective assistance by failing to call P.C. as a witness.

The record is insufficient to support Simpson's argument. A claim of ineffective assistance of counsel " 'must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and the likelihood for exonerating the accused.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) P.C.'s declaration generally stated that she and her family went on overnight trips with Simpson when she was a young girl, but her declaration contained no specifics about whether she was ever left alone with Simpson on the overnight trips.[23] It is unclear if her testimony would have

---

[23] P.C.'s declaration stated that "[w]e" (implying her and her family) went on trips with Simpson's family.

established that Simpson had the opportunity to be alone with her during the trips. Since the record does not demonstrate that P.C.'s testimony would have been helpful to the defense, Simpson's claim of ineffective assistance of counsel fails. (See *ibid.*)

### 7. *Failure to Investigate Exculpatory Evidence*

#### i. *Background*

According to wife's declaration, older brother lived with sister-in-law in the Doe family house after they were married in 2005. Wife stated that when older brother and sister-in-law were dating, she often saw them sitting on her parents' bed, watching a movie with older brother's hand down sister-in-law's pants. Wife did not know if the victims went into the bedroom or if they ever saw older brother and sister-in-law engage in that type of behavior.

#### ii. *Analysis*

Simpson argues that his trial counsel was ineffective for failing to pursue exculpatory evidence about sister-in-law and older brother. He argues that older brother lived in the Doe family house when some of the incidents occurred, and, according to wife's declaration, wife often saw older brother and sister-in-law engaging in behavior similar to the way the victims were molested. Simpson claims this evidence would have been exculpatory because it suggested that older brother could have been the source of victim1's and victim2's memories.

Trial counsel's declaration does not explain why he did not pursue this evidence. "Although trial counsel clearly has a duty to adequately investigate possible defenses to enable formulation of an informed trial strategy [citation], we will not presume from a silent record that counsel failed in this duty." (*People v. Jennings* (1991) 53 Cal.3d 334, 375.) Moreover, we cannot conclude that there was no rational tactical reason for his omission. The only source of the evidence against sister-in-law and older brother came from wife's declaration, and her declaration made it clear that she did not know if her

96

sisters ever saw older brother and sister-in-law engage in that type of conduct. Trial counsel may have also reasonably believed that arguing that the victims' own older brother was the source of their memories of molestation may have alienated the jury. Based on this record, Simpson cannot demonstrate that his trial counsel was ineffective for his alleged failure to investigate. (See *Riel*, *supra*, 22 Cal.4th at p. 1185.)

### I.   *Cumulative Effect of Trial Counsel's Multiple Failures*

Simpson argues that even if none of his counsel's failings are individually prejudicial in isolation, they were cumulatively prejudicial. In this case, we have found that some of Simpson's claims of ineffective assistance of counsel are without merit or are not supported by the record. For the purposes of our analysis of the cumulative impact of trial counsel's instances of ineffective assistance, we consider only those acts or omissions where we have found that claims of trial counsel's ineffective assistance had merit but were not individually prejudicial and those acts or omissions where we did not reach the performance component and resolved the claim of ineffective assistance of counsel by reaching the prejudice prong first, including: (1) trial counsel's failure to call Dr. Stein as a witness, (2) trial counsel's failure to introduce Simpson's assertion that the victims' allegations were "disgusting" in the pretext phone call, (3) trial counsel's failure to object to the fresh complaint evidence that exceeded the scope of the doctrine, and (4) trial counsel's failure to request a good character instruction.

We conclude that if we cumulate the prejudicial impact of these omissions, Simpson has not met his burden to demonstrate that it is reasonably probable that he would have received a more favorable verdict. When analyzing a claim of ineffective assistance of counsel, we are concerned with whether trial counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) "The Sixth Amendment guarantees reasonable competence, not

97

perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry*, *supra*, 540 U.S. at p. 8.)

We recognize that the jury appeared to have doubts about victim2's testimony concerning the alleged incident that took place when she had a nightmare because it did not reach a verdict on count 1. The evidence against Simpson, however, was relatively strong, and the jury credited the victims' testimonies as it reached guilty verdicts on all other counts. As we have described many times before, victim1 and victim2 both made fresh complaints to various witnesses at various times, including mother, sister-in-law, J.G., C.A., and A.C.2, and the victims specifically identified Simpson as the one who molested them. There was also no evidence that the victims were biased against Simpson or had a reason to lie about what happened.

Accordingly, we conclude that even if we cumulate the prejudicial effects of trial counsel's errors, it is not reasonably probable that Simpson would have received a more favorable verdict.[24] (*In re Jones* (1996) 13 Cal.4th 552, 587 [cumulative effect of ineffective assistance of counsel is prejudicial if "there exists a reasonable probability that the outcome . . . would have been different but for the cumulative impact of defense counsel's numerous failings"].)

### J. Cumulative Prejudice

Simpson's final argument is that the cumulative effect of the trial court's alleged errors denied him due process and a fair trial. However, we have found only that the trial court made errors in the admission and the instruction of the use of the prior uncharged act that A.C. testified about under Evidence Code section 1108. Because there are no

---

[24] We note that to the extent that the record on appeal is insufficient to establish a claim of ineffective assistance of counsel, the appropriate avenue to develop the record is to file a petition for writ of habeas corpus with sufficient allegations to state a prima facie case. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

98

other errors to cumulate, defendant's claim of cumulative prejudice fails.  (See *In re Reno* (2012) 55 Cal.4th 428, 483.)

## DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
GROVER, J.

*People v. Simpson*
**H045973**